**ESSEX ELECTRO ENGINEERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 480–83C.

United States Claims Court.

Aug. 12, 1983.

As Amended Sept. 19, 1983.

Fred Israel, Washington, D.C., for plaintiff. Eugene F. Shine, Israel & Raley, Chartered, Washington, D.C., of counsel.

Alvin A. Schall, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Janis P. Rodriguez, F.A.A., Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This is a suit for temporary, preliminary, and permanent injunctive relief and a declaratory judgment restraining the Federal Aviation Administration (the "FAA") from awarding a contract to any bidder other than plaintiff Essex Electro Engineers, Inc. ("Essex"), declaring that Essex is entitled to award of the contract, and directing the FAA to award the contract to Essex.[1] The parties have cross-moved for summary

---

1. Because defendant agreed to withhold award of the contract pending a decision on Essex's motion for preliminary injunction, plaintiff's application for a temporary restraining order was mooted. The hearing on the preliminary injunction was conflated with that on the merits pursuant to RUSCC 65(a)(2) after the parties cross-moved for summary judgment.

judgment on the merits, and a hearing has been held.

## FACTS

Over one year ago, the FAA issued Invitation for Bids No. DTFA–02–82–B–00663 (the "IFB") for the production of 17 engine generator sets to be used at new automated flight service stations in different locations within the United States. On September 9, 1982, eight bids were opened displaying a range of approximately $600,000. The low bidder was Forster Enterprises ("Forster") at $777,746; Essex's bid of $845,560 was the second low bid; and Introl Corporation ("Introl") was the third low bid at $969,325. Forster provisionally was found to be the lowest responsive and responsible bidder by the FAA and the Small Business Administration.

Shortly thereafter, Introl initiated what has proved to be unflagging efforts to eliminate Forster and Essex. In its first protest lodged with the General Accounting Office (the "GAO"), as clarified by a subsequent letter, Introl urged two arguments, one of which would have disqualified Introl's own bid. The FAA rebuffed Introl and recommended that the GAO deny this protest. In connection with Introl's first protest, the contracting officer had submitted his statement finding both Forster and Essex responsive. Introl then addressed another protest to the GAO, and, after clarifying its protest both orally and in writing (the record is incomplete as to Introl's communications with the FAA and GAO on its protest), Introl found a more receptive audience.

The IFB specified engines operating at 60 Hertz in accordance with certain requirements, one of which was that the engine run at a maximum synchronous speed of 1200 rpm. The IFB provided in pertinent part:

NOTICE H SUBMITTAL OF DATA

1. The Bidder is requested to furnish descriptive literature for the proposed engine, generator, and transfer equipment . . . . This is requested for information purposes only, but any equipment furnished during the contract performance must comply with paragraphs 3.3.2, engine; 3.4.1, generator; . . . and any and all pertinent paragraphs of specification FAA–E2204c, as amended.

The IFB also required identification of the manufacturer and model of the engine which the bidder proposed to furnish.

Forster offered a Cummins NT–855G engine and submitted several descriptive commercial bulletins. This material revealed that the proposed Cummins engine operated at 1500 rpm or 1800 rpm engine output and not the required 1200 rpm. For its part Essex offered to supply the same Cummins engine or an Allis-Chalmers No. 6138T engine.[2] Essex did not provide any descriptive literature on the Cummins engine, although two pages of literature applicable to a standard model Allis-Chalmers engine were included. This literature did not address engine output. Introl based its bid on a General Motors No. 8V–71 series engine "1200 rpm per spec." and tendered no descriptive literature or model number.

The cover letter accompanying Essex's bid stated in part:

Enclosed herewith is our bid for referenced solicitation, including some descriptive literature. It is to be noted that the literature submitted is general in nature, and is not intended to completely describe the items.

If any specification conflicts, or ommissions [sic] exist between the general literature and the bid specification, the bid specification FAA–E–2204c as amended, shall govern.

Proposed sources are listed for information purposes only, and other sources of supply which meet all the applicable requirements of the specification FAA–E–2204c, as amended, may be supplied.

**2.** Allis-Chalmers revised its engine designations. The model number submitted by Essex, 6138T, previously was known as a 21000 engine. The descriptive literature proffered by Essex contains both designations; however, it is the same engine.

Introl's second-wave protest was that both Forster and Essex were nonresponsive because the descriptive literature submitted with Forster's bid disqualified the Cummins engine. Given that the Cummins engine was identical to one of the two engines Essex proposed to furnish, Essex's bid was rendered nonresponsive,. as well. Introl contended that Essex's submission of partial literature on the Allis-Chalmers was inconsistent with the IFB specification requirements in that "the missing pages of the descriptive literature [furnished by Essex] for the Allis [sic] Chalmers engine show that this engine operates at 1800 rpm." Feb. 23, 1983 ltr. from FAA to GAO at 3. The FAA obtained a complete brochure from Allis-Chalmers that confirmed Introl's allegation. The FAA concluded that the engines specified by Essex were noncomplaint, determined that the Forster and Essex bids were nonresponsive and that Introl's was responsive, and so advised the GAO. These decisions sparked Forster's protest. Essex appeared before the GAO as an interested party.

On June 9, 1983, the GAO issued its decision upholding Introl's protest, denying Forster's, and declaring Introl responsive and both Forster and Essex nonresponsive. *Introl Corp.*, B–209096, 83–1 C.P.D. ¶ 633 (June 9, 1983) [hereinafter "*Introl* GAO decision"]. In addition to basing its rejection of Essex on the nonresponsiveness of the Cummins engine, the GAO agreed with the FAA that the descriptive literature on the Allis-Chalmers engine indicating normal operation at 1800 rpm and the need for modifications to enable operation at 1200 rpm rendered Essex's bid nonresponsive. Essex's evidence supporting compliance was not considered, "because a contracting agency's determination whether a product offered by a bidder meets the solicitation specifications must be based on the data submitted with the bid. ..." *Introl* GAO decision at 6 (citation omitted). Moreover,

according to the GAO, Essex's bid as to the output of the Allis-Chalmers engine was ambiguous based on literature submitted and, thus, nonresponsive. Introl's bid was deemed responsive based, in part, on descriptive literature submitted after Forster protested that the General Motors engine did not operate at 1200 rpm.

Relying on the GAO decision, the contracting officer recommended award of the contract to Introl. The FAA's Procurement Review Board concurred.

After the *Introl* GAO decision, Forster unsuccessfully sought in this court to enjoin issuance of the contract to Introl and to mandate an award in its favor. *Forster Enterprises v. United States*, No. 443–83C (Cl.Ct. July 21, 1983) (HARKINS, J.). In the interim Essex had submitted a request for reconsideration of the GAO decision. Upon the filing of Essex's suit in this court, a call was issued on the GAO to render its decision on reconsideration prior to the hearing on the preliminary injunction. GAO did not respond to the call. At argument defendant asked the court to consider GAO's June 9, 1983 decision as final.

## DISCUSSION

■ The rejection of Essex's bid as nonresponsive should not be overturned unless no rational basis exists for the agency's determination. *Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 237 (1983) (NETTESHEIM, J.), *affirmed*, 723 F.2d 69 (Fed.Cir.1983) (citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). This standard is more restrictive than upholding administrative action unless arbitrary or capricious. *Compare Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C.Cir. 1970), *with M. Steinthal & Co.*, 455 F.2d at 1301. Measured against the strict rational basis standard, the procurement decision in this case must be disturbed.[3]

---

**3.** Defendant has not argued that subject matter jurisdiction is lacking because Essex challenges either a procurement regulation, *see Downtown Copy Center v. United States*, 3 Cl.Ct. 80 at 81–82, (1983) (MARGOLIS, J.); *Cecile*

*Industries, Inc. v. United States*, 2 Cl.Ct. 690 at 693 (1983) (WIESE, J.); *Gibraltar Industries, Inc. v. United States*, 2 Cl.Ct. 589, 590–91 (1983) (MEROW, J.); *Quality Furniture Rentals, Inc. v. United States*, 1 Cl.Ct. 136, 140

*The Procurement Decision*

Essex first argues, unsuccessfully, that the contracting officer acquiesced in the decision of the GAO and that the only independent determination of responsiveness by the contracting officer was in favor of Essex and Forster. Essex takes this position because the FAA interceded after Forster provisionally was determined to be the successful bidder and because, once all protests were resolved by the GAO with the FAA's advice, the contracting officer adopted the GAO's decision.

The contracting officer never determined that Essex's bid was responsive other than in connection with Introl's first protest. In any event, the decision of a contracting officer need not be that of the individual so titled. Although a contracting officer must "put his own mind to the problems and render his own decisions....," *New York Shipbuilding Corp. v. United States,* 180 Cl.Ct. 446, 460, 385 F.2d 427, 435 (1967); *e.g., J.A. Terteling & Sons, Inc. v. United States,* 182 Cl.Ct. 691, 694, 390 F.2d 926, 927 (1968) (per curiam), accommodation by the contracting officer and agency to positions formally taken by the GAO is the usual policy, if not obligatory. *A.G. Schoonmaker Co. v. Resor,* 445 F.2d 726, 728 (D.C.Cir. 1971); *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390–91, 325 F.2d 438, 442 (1963); *see Henry Spen & Co. v. Laird,* 354 F.Supp. 586, 590–91 (D.D.C.1973). *See generally Pacific Architects & Engineers, Inc. v. United States,* 203 Cl.Ct. 499, 516–17, 491 F.2d 734, 744 (1974) (no implied prohibition

(1983) (KOZINSKI, C.J.), or the terms of the IFB. *See Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 375–76 (1983) (KOZINSKI, C.J.). These cases distinguish between a claim based on a statute, regulation, or terms of a procurement, on the one hand and, on the other hand, a claim based on a contracting officer's exercise of discretion in according a bid full and fair consideration compared with all other bids. *See AABCO, Inc. v. United States,* 3 Cl.Ct. 109, (Cl.Ct.1983) (YOCK, J.); *Dean Forwarding Co. v. United States,* 2 Cl.Ct. 559 (1983) (HARKINS, J.); *Harris Data Communications, Inc.,* 2 Cl.Ct. 229.

The judges of this court have attempted to resolve the inconsistency between the congressional directive that, in exercising its new equitable jurisdiction, the Claims Court should apply the *Scanwell* doctrine, *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir. 1970), and its progeny, *see Harris Data Communications, Inc.,* 2 Cl.Ct. at 236–38 (citing authorities), with the grant of jurisdiction limited to contract claims within the Claims Court's jurisdiction. *See Systems Architects, Inc. v. United States,* 2 Cl.Ct. 456, 460–61 (1983) (NETTESHEIM, J.) (citing authorities).

The problem is that *Scanwell* has been interpreted to reach not only arbitrary or capricious action by the contracting officer, but violation of statutes or regulations, *e.g., Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1312 (D.C.Cir. 1971). This court's jurisdiction over contract claims pre-award, however, derives from the implied-in-fact contract that a bid conforming to terms of the procurement shall be accorded fair and full consideration. *See United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 & n. 8 (Fed.Cir.1983) (citing *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970)). Resolution of the problem is aided by the Senate Committee's caveat that exercise of the Claim Court's new injunctive authority should be limited to arbitrary and capricious action by the contracting officer, *see United States v. John C. Grimberg Co.,* 702 F.2d at 1374 n. 19 (citing S.Rep. No. 275, 97th Cong., 1st Sess. 23 (1981)), without mentioning statutes or regulations. Nonetheless, all procurements cognizable in this court are carried out pursuant to regulations.

The decisions in *AABCO, Dean Forwarding Co.,* and *Harris Data Communications,* which involved challenges to a contracting officer's interpretations in implementing the terms of solicitation documents, recognize the duty of a contracting officer to exercise his discretion consistently with applicable federal regulations as one aspect of the implied-in-fact contract to consider a bid fully and fairly. Another aspect of that contract is that the terms of the procurement as they impact on the contracting officer's exercise of discretion are part of the contract to give full and fair consideration. Therefore, this court has jurisdiction to examine a challenge to a discretionary determination implementing a regulation or terms of a procurement.

It is posited that the court should focus its jurisdictional inquiry on whether plaintiff challenges (a) action of the contracting officer (or agency) (b) which discriminates irrationally or unfairly distinguishes between one bidder and another or others (c) on the basis of criteria the determination of compliance therewith rests within the contracting officer's (or agency's) discretion. *Compare Gibraltar Industries, Inc. v. United States,* 2 Cl.Ct. 589, *with Related Industries, Inc. v. United States,* 2 Cl.Ct. 517 (1983) (MILLER, J.), *and Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613 at 621 (1983) (YANNELLO, J.).

against contracting officer's first obtaining or even agreeing with the views of others).

That an agency's procurement decision can be based on advice from the GAO, however, does not make the GAO's decision dispositive upon judicial review of the agency action. "The Court of Claims is not bound by the views of the Comptroller General, nor do they operate as a legal or judicial determination of the rights of the parties. . . ." *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 63, 617 F.2d 590, 597 (1980) (citation omitted); *see Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir.1971); *M. Steinthal & Co.,* 455 F.2d at 1304–06; *American Electric Contracting Corp. v. United States,* 217 Ct.Cl. 338, 353–56, 579 F.2d 602, 610–12 (1978). In the end the court must evaluate the rationality of the GAO's decision which guided the decision of the contracting officer. *Wheelabrator Corp.,* 455 F.2d at 1316–17.

*The Responsiveness Determination*

Essex's bid was determined to be nonresponsive based on the following analysis. Essex specified the Cummins NT–855–G engine and the Allis-Chalmers 6138T engine. In response to Introl's first protest, the FAA contended that literature merely requested by an IFB could not be relied upon to determine responsiveness, a view shared by the contracting officer. Reversing itself in response to Introl's second protest, the FAA took the view before the GAO that the proposal reserved to Essex the right to furnish either engine. Since the Cummins engine was held nonresponsive in the course of rejecting Forster's bid, based on the literature Forster submitted on request, Essex had reserved to itself the right to furnish a nonresponsive engine, and its bid thus was nonresponsive. The *Introl* GAO decision, as to both Forster and Essex, based the Cummins engine's noncompliance with the IFB on Forster's bid. Although Essex offered literature available as of the date of bid opening showing that the Cummins engine could operate at 1200 rpm,[4] this literature was not addressed in the GAO decision. (Publicly available commercial literature is hereinafter referred to as "literature.")

In also ruling that the Allis-Chalmers engine was nonresponsive, the GAO stated that "[i]t is clear from the record . . . ." that the Allis-Chalmers engine operated only at 1800 rpm absent modification, *Introl* GAO decision at 6, although nothing in Essex's bid literature so stated. The GAO reached this result because the FAA obtained from the manufacturer the two remaining pages of the four-page brochure from which Essex's submission was taken. These two additional pages indicated operation at 1800 rpm.[5] The manufacturer provided Essex with literature available as of the date of bid opening including graphs showing operation at 1200 rpm. These Essex-sponsored materials were not considered timely. By judging both Essex engines nonresponsive, GAO was not required to address Essex's contention that if either engine complied the bid was responsive.[6]

4. In connection with its reconsideration request, Essex offered graphs obtained from Cummins. This literature was in existence as of the date of bid opening showing that the designated model could operate at 1200 rpm. Before the *Introl* GAO decision was issued on June 9, 1983, the GAO had Essex's proffer of other literature from Cummins showing that the Cummins engine operated at 1200 rpm.

5. Operation was indicated at 2100 rpm, 1800 rpm, and 1400 rpm.

6. The FAA objected to Essex's contention by arguing that if only one engine complied with the specifications, Essex reserved to itself the option of supplying a noncompliant engine. Thus, Essex's bid was ambiguous.

In the rubric of procurement, an alternate bid is one which offers to supply something other than what an IFB requires as an alternate method of meeting the Government's needs. Such bids are nonresponsive. On the other hand, a bid might offer several alternative responsive items at different prices, the lowest of which can properly be considered. *See generally Brown Boveri Corp.,* 33 Comp.Gen. 499 (1954). The cases cited by the FAA for the proposition that an ambiguity renders a bid nonresponsive are not helpful because they involve ambiguity arising from bids containing only one item, not the choice between two, which is present here. *See, e.g., Dominion Road Machinery Corp.,* 56 Comp.Gen. 334 (1977).

If only one of the two Essex engines is responsive, then the bid is itself responsive.

The first landmark in analysis is the moment the bids are opened. The initial task after opening is to determine responsiveness. 41 C.F.R. ¶ 1–2.404–2 (1982). Bids are to be evaluated according to their contents at that time. *Franklin Instrument Co.,* B–204311, 82–1 C.P.D. ¶ 105 (Feb. 8, 1982); *Lektro Inc.,* B–202212, 81–1 C.P.D. ¶ 484 (Jun. 15, 1981). *See* 41 C.F.R. §§ 1–2.407–1, 1–2.405. An award generally will be made to the lowest conforming bid by a responsible bidder. 41 U.S.C. § 253 (1976); 41 C.F.R. 1–2.407–1(a).

█ Because the IFB requested literature, this case does not involve 41 C.F.R. § 1–2.202–5 (1982), which sets forth restrictions on the use of required or unsolicited literature in evaluating bids.[7] When required, the literature is used to determine if the items offered meet an IFB's requirements. When unsolicited, literature accompanying a bid is ignored unless it is clear that the bidder intended the literature to qualify its bid. Such an indication can arise, for example, when a bidder names a model number and includes unsolicited literature bearing the same model number. The contracting officer in such a case properly should consider the literature. *Lift Power Inc.,* B–182604, 75–1 C.P.D. ¶ 13 (Jan. 10, 1975).

█ Two additional considerations, however, are relevant to this proceeding. A bidder may present evidence during the period between bid opening and award as to its responsibility as a contractor, but not regarding the responsiveness of his bid to an IFB.[8] *See Concept Merchandising Inc.,* B–187270, 76–2 C.P.D. ¶ 505 (Dec. 17, 1976). If a bid is ambiguous, for example, when a

*Brown Boveri* implicitly contemplates that some items offered are alternates and can be rejected without creating an ambiguity as to the bidder's intent to be bound by the IFB specification through other responsive items: "[T]he making of an unacceptable 'alternate' bid does not preclude consideration of other proposals submitted in the same bid which conform to the requirements of the specification . . . ." 33 Comp.Gen. at 501. Assuming that either of Essex's engines was nonresponsive, the FAA in this case had the option of accepting the responsive engine and striking the nonresponsive item, thereby binding Essex to supply a responsive engine.

7. The court agrees with Judge Harkins' decision in *Forster Enterprises v. United States,* No. 443–83C, that the agency could consider literature supplied by a bidder on request. Forster was rejected on the basis of information in its bid that showed engine output rendering the bid nonconforming. Moreover, Forster did not certify compliance at specification.

8. Arguing that the issue is one of bidder responsibility, Essex relies heavily on *Concept Merchandising, Inc.,* wherein the GAO sustained a protest by four excluded bidders that a requirement for literature (color lists) could be waived because it was material to bidder responsibility and not to responsiveness. The court notes that if the question were viewed as one of bidder responsibility, Essex would have been allowed before award to bolster its bid with literature. *Mark Dunning Industries, Inc.,* B–206569, 82–1 C.P.D. ¶ 261 (Mar. 19, 1982).

Responsiveness is the intent as reflected in the bid to be bound legally by the IFB specifications; responsibility is the method by which that obligation will be met. As stated by the GAO, "[T]he concept of responsibility specifically concerns the question of a bidder's performance capability, as opposed to its promise to perform the contract, which is a matter of responsiveness." *Propper Manufacturing Co.,* B–2061933, 82–1 C.P.D. ¶ 269 (Mar. 10, 1982). More succinctly, the distinction is whether the bidder will conform to the IFB, as opposed to how the bidder will accomplish conformance. *See Skyline Credit Corp.,* B–209193, 83–1 C.P.D. ¶ 257 (Mar. 15, 1983).

Although easily stated, the distinction can be difficult to apply in practice, even when the IFB declares that compliance is a question of responsiveness. *See e.g., International Business Investments,* B–206474, 82–1 C.P.D. ¶ 500 (May 27, 1982) (IFB requirement, listed as an item to be considered as part of the bid responsiveness, held a question of responsibility because it went to the ability of the bidder to perform its obligations).

Information used for responsibility determinations, however, can render a bid nonresponsive if it indicates no intent to comply with IFB specifications. *Twehous Excavating Co.,* B–208189, 83–1 C.P.D. ¶ 42 (Jan. 17, 1983). *But see Schreck Industries,* B–204050, 82–2 C.P.D. ¶ 14 (July 6, 1982) (modification to a standard design without an IFB limitation on such modifications is a question of responsibility going to the bidder's experience in making the item). Here, the underlying factual issue is whether Essex's engine designations can operate at 1200 rpm and is a matter of responsiveness; the means by which an engine is "modified" to so perform is a question of responsibility.

specific item is proposed in a bid, the question may be raised whether the item conforms to the IFB and thus whether the bidder intends to be bound by the IFB. In this event the agency then may turn to literature to determine whether the bid conforms to an IFB. *See, e.g., Dictaphone Corp.,* B–204966, 82–1 C.P.D. ¶ 452 (May 11, 1982).

The authorities less clearly define the duty of a contracting officer if a responsiveness question arises not from the bid itself, but from literature supplied by another bidder or obtained at the agency's initiative. Defendant's cases are not instructive, because they involve ambiguities or indications of nonresponsiveness in the original bid literature and not in literature obtained outside the bid. *See, e.g., Dictaphone Corp.,* 82–1 C.P.D. ¶ 452; *Lift Power, Inc.,* B–182604, 75–1 C.P.D. ¶ 13 (Jan. 10, 1975).

*Responsiveness at Time of Bid Opening*

At bid opening Essex's bid was unambiguous and unequivocal. The bid designated two engines as conforming and submitted requested literature on one of the engines that rationally could not be construed to create an ambiguity. In *Wayne Press Co.,* 49 Comp.Gen. 851 (1970), the GAO seemed to confirm that bids are to be evaluated based on their contents and not those of other bids: "In our view the intent of the bid must be determined from a reasonable construction of its entire contents including any unsolicited literature." 49 Comp.Gen. at 852.

The GAO apparently agreed with the FAA's argument that because the literature on the Allis-Chalmers engine was partial Essex's bid suffered from ambiguity. *Cf. International Signal & Control Corp.,* B–185868 76–1 C.P.D. ¶ 180 (Apr. 30, 1976) (omission not cured by incorporation by reference of a table of contents in the bidder's acknowledgment of amendment to the IFB, which amendment referred to the table of contents.) To the contrary, Essex's bid literature did not speak to engine output. That the FAA was advised by Introl that the information was partial could not ra-

tionally suggest omission of disqualifying data on engine output or on any other feature. (Of course, Introl also pointed out that, in addition to being a partial submission, the missing brochure pages showed noncompliance.) This is why the GAO also grounded its rejection of the Allis-Chalmers engine on "the record," which had been augmented by the two pages of literature obtained by the FAA that showed noncompliance with the specification on engine output.

Essex's cover letter accompanying its bid unequivocally stated that any conflict or omission in the informational literature regarding the specifications would be governed by the specifications. In effect, Essex parroted the IFB which stipulated that literature was "requested for information purposes only, but any equipment furnished during contract performance must comply [with the IFB on, *inter alia,* engine output]...." The GAO considers bids which substantially restate the IFB specifications to be responsive. *See Hub Testing Laboratories,* B–199368, 80–2 C.P.D. ¶ 204 (Sept. 18, 1980).

Defendant objects to Essex's cover letter on two grounds. First, Essex may have contemplated "other sources of supply which meet all the applicable requirements of the specification" so that—assuming that the models designated were nonresponsive—responsive engines might be supplied. Such a construction, the argument runs, would render the bid nonresponsive because of the ambiguity as to whether an acceptable or unacceptable engine would be supplied. Second, defendant objects that the term "applicable requirements" reserves to Essex the right to choose what specifications are applicable. The first objection fails because, at bid opening, both the Cummins and Allis-Chalmers engines proposed by Essex in its bid complied with the IFB. Therefore, the quoted language reserved to Essex the right to furnish a complaint engine obtained from another supplier. If, however, the Cummins and Essex engines were nonresponsive, Essex could not have

reserved any such right.[9] As to defendant's second argument, the proposed reading ignores the full text of the sentence which refers to "*all* the applicable requirements of the *specification FAA–E–2204c*" (emphasis added). The reference is to "all" of the pertinent specification and cannot be said fairly to equivocate.

■ The FAA's argument that neither Essex engine can operate at 1200 rpm without modification is insubstantial. The FAA admitted in an April 4, 1983 letter to GAO that modification to standard engine designs was contemplated by the IFB and was permissible. In disputing Essex's challenge that Introl failed to list engine model numbers, as required by the IFB, the GAO noted: "The FAA states most manufacturers offer a series of engines or generators with the same general design and numerous options because the general design can be modified in its details to meet any unique requirements which might be imposed by a purchaser...." *Introl* GAO decision at 7–8.

For the proposition that Essex should have noted the modifications to the model proposed in its bid, the FAA cited *Log E/Spatial Data Systems, Inc.*, B–205016, 82–1 C.P.D. ¶ 465 (May 17, 1982). The case stands for the proposition urged by the Department of Justice that the agency properly can consider unsolicited literature. In *Log E* the unsolicited literature in the bid indicated that the proposed item did not meet the specifications and for that reason modifications would have been necessary to make the item compliant. No such modifications were proposed in the bid.

For the foregoing reasons, the agency decision that Essex's bid was ambiguous on

its face "based on the data submitted with its bid," *Introl* GAO decision at 6, was irrational.

*Responsiveness Based on Consideration of Literature Available as of the Time of Bid Opening*

■ When the FAA obtained literature that detracted from Essex's bid, the agency irrationally refused to consider contemporaneously available literature that showed the ability of Essex's proposed engines to operate at 1200 rpm.

Subsequent to bid opening, the FAA solicited from Allis-Chalmers the standard engine brochure which gave examples of performance of the engine at 1500 and 1800 rpm. When a contracting officer solicits literature, he has a duty to obtain all relevant literature, subject to objection by other bidders that the documents do not qualify as literature. In this case the FAA could have obtained literature on the subject of Introl's protest, rpm performance. After the *Introl* GAO decision issued, Allis-Chalmers confirmed that such literature would have been provided to the FAA, but the FAA only requested the standard brochure. Literature showing compliance was itself available before GAO in advance of the decision date.

Thus, although the FAA rationally requested the remaining pages of the brochure, it was not rational to limit its review to the brochure when presented with other complementary literature showing compliance.

The *Introl* GAO decision also refused to consider Essex's proffered literature showing 1200 rpm performance of the Allis-Chalmers engine because it was not in the original bid.[10] However, the GAO went beyond

9. A similar objection to assurances of compliance in an Essex cover letter was sustained in *Cummins Diesel Engineers, Inc.*, 55 Comp.Gen. 999, 1003 (1976), cited by neither party. In that case Essex promised to furnish from sources "as specified or equal." The IFB descriptive schedule required information as to exactly what was to be furnished, but Essex failed to complete the schedule. Essex thus reserved to itself the decision as to what was "equal." Descriptive literature was not required in the present case. Moreover, Essex's

cover letter stated unequivocally that "the bid specification ... shall govern ...." what was to be supplied.

10. The GAO decision relied on to support the exclusion, *Lektro Inc.*, B–202212, 81–1 C.P.D. ¶ 484 (Jun. 15, 1981), was based on literature accompanying the bid that created an ambiguity and was subject to regulations applicable to required literature.

Essex's bid to Forster's bid for literature on the Cummins engine.[11] Essex was not allowed to rely on available countervailing literature to show conformance of the Cummins engine. The determination to exclude Essex's literature on the Cummins engine also lacked a rational basis.

Defendant's cases do not support rejection of information available at bid opening that was submitted by Essex after bid when the agency had consulted literature from other sources. *United McGill Corp.,* B–190418, 78–1 C.P.D. ¶ 119 (Feb. 10, 1978), involved unsolicited literature containing exceptions to the IFB requirements submitted in the protestor's own bid. In *Dominion Road Machinery Corp.,* 56 Comp. Gen. 334, *aff'd on reconsid.,* 77–1 C.P.D. ¶ 212 (Feb. 4, 1977), the offensive, ambiguity-creating literature was contained in the bid. There was no need in fairness to let the bidder respond to information disqualifying its bid when previously it had control of the information used against it. Required literature was at issue in *Raytheon Co.,* 48 Comp.Gen. 420 (1968). The contracting officer went beyond the bid literature to determine compliance with the specification. This was held improper, although because of the advanced stage of the procurement the award was not disturbed. *A.L. Leftheriotis, Ltd.,* B–190720, 78–1 C.P.D. ¶ 251 (Mar. 30, 1978), involved required literature that showed nonconformance submitted with the disqualified bidder's own bid. *Accord, Waukesha Motor Co.,* B–178494(1), 74–1 C.P.D. ¶ 329 (June 18, 1974). In *Devault Manufacturing Co.,* B–195959, 80–1 C.P.D. ¶ 18 (Jan. 7, 1980), rejection was based on the unsolicited literature contained in the bid itself.

*Pure Air Filter International,* B–188047, 77–1 C.P.D. ¶ 342 (May 13, 1977), states that literature cannot be submitted after bid opening, but is limited to situations where no model number has been designated in the bid. In such circumstances a bidder might furnish literature on items it had not

contemplated furnishing in the bid and thereby render a nonresponsive bid responsive. The same situation is not present because Essex designated model numbers and the literature it proffered related to those models. In *Data-Chron, Inc.,* B–196801, 80–2 C.P.D. ¶ 78 (Jul. 29, 1980), the initial determination of nonresponsiveness was made based on literature accompanying Data-Chron's bid. Unlike this case, wherein the FAA went directly to the manufacturer, the agency required additional literature from Data-Chron. A letter suggesting responsiveness was submitted. Because the letter was not "descriptive literature available to the public prior to bid opening," the GAO disallowed its consideration in evaluating Data-Chron's bid. The result does not affect this case. In addition to letters from the manufacturer, which would appear to be objectionable under the approach of *Data-Chron,* Essex has identified "descriptive literature publicly available prior to bid opening," which shows performance at 1200 rpm for both engines.

In rejecting Essex's bid as nonresponsive, the FAA went beyond the four corners of Essex's bid and, in doing so, failed to consider publicly available commercial literature that showed Essex's bid to be responsive. As a result the procurement decision was irrational.

*Unfair Treatment of the Bidder*

Essex charges that the FAA, after consultation with the GAO, unfairly determined that Introl's bid was responsive because, *inter alia,* Introl was allowed to submit literature supporting the compliance of its proposed engine. Relying on *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983) (KOZINSKI, C.J.), defendant argues that a bid must comply with a solicitation as a prerequisite to the contract of fair dealing. A claim concerning Introl's bid does not involve Essex's compliance with the solicitation and thus is irrelevant. The

---

11. The court does not hold that a contracting officer must ignore literature from sources other than a given bid that can be the basis for a determination of nonresponsiveness at bid opening. The decision to exclude countervailing literature available as of bid opening, however, can render a finding of nonresponsiveness vulnerable.

court agrees that the responsiveness of Introl's bid happily is not its concern today. *Burroughs Corp.,* 223 Ct.Cl. at 66, 617 F.2d at 598. How Essex was treated vis-a-vis Introl is a proper inquiry, and the court finds that Essex was unfairly treated.

 Essex's challenge to the FAA's consideration of the Forster, Essex, and Introl bids differs from that in *Ingersoll-Rand* in which the challenge was levied against the terms of an invitation for bids. In this case the alleged unfair consideration arises in the agency determination of compliance. In rejecting Forster's challenge, the GAO found 1) that the literature Forster submitted did not "conclusively establish" that the GM 8V–71 engine operated at 1500–1800 rpm; and 2) that "[o]ther performance data in the literature indicates that the 8V–71 series engine operates at 1,200 rpm. Further, we note that Introl states that GM 8V–71 Brochure 35A133 showed engine operation at 1,200 rpm." *Introl* GAO decision at 8. Allowing Introl's bid to be bolstered based on literature subsequently submitted, but denying Essex the same opportunity, is unfair. Although the implied contract of fair and full consideration derives from a responsive bid, the procurement authority cannot avoid the formation of this contract by determining the compliance in other than an even-handed manner. *See supra* note 3. The contract of fair dealing arises upon submission of a bid. The determination of nonconformance, if the product of the contracting officer's discretion, cannot be the result of treating bidders unfairly in applying the criteria rendering a bid noncompliant.

Defendant argues that a bidder can clarify its bid with literature if its bid is responsive on its face against a challenge, such as Forster's challenge to Introl. However, the agency is not required to consider literature available at bid opening if tendered in support of an ambiguous bid, such as Essex's. Thus, no disparate treatment is evident. This argument lacks any rational reason to support the distinction.

Another distinction made between the bidders by GAO concerned Essex's designa-

tion of an Allis-Chalmers 6138T engine, standard modifications to which permit operation at speeds from 800 to 2600 rpm (including 1200 rpm), and Introl's designation of the GM 8V–71 engine, some models of which run at 1200 rpm, but some of which do not. The latter is acceptable to the GAO; the former is not. The GAO concluded that Essex was "overly narrow" in objecting to Introl's failure to list a particular model in the series, because Introl qualified its unnumbered series as "1200 rpm per spec." *Introl* GAO decision at 8. The distinction between the two designations of engines is without substantial difference, having the same disparity in meaning as the phrases "the letters A–Z" and "the alphabet." No case is offered to support the distinction.

 In addition to the irrational rejection of Essex's bid as nonresponsive at bid opening and irrational refusal to consider along with literature obtained from other sources literature sponsored by Essex that was available at bid opening to show compliance, the agency decision treated Essex unfairly insofar as literature favorable to Introl was considered.

*Appropriateness of Injunctive Relief*

The remaining three requirements to support permanent injunctive relief, *see A.G. Schoonmaker Co. v. Resor,* 319 F.Supp. 933, 941 (D.D.C.), *rev'd on other grounds,* 445 F.2d 726 (D.C.Cir.1971), have been satisfied. Absent injunctive relief, Essex would be irreparably damaged, and an action at law would be unavailing because Essex could recoup its bid preparation costs in a suit for damages, but not loss of anticipated profits. *See M. Steinthal & Co.,* 455 F.2d at 1302; *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 575, 492 F.2d 1200, 1204 (1974); *General Electric Co. v. Seamans,* 340 F.Supp. 636, 640 (D.D.C.1972).

Permanently enjoining the FAA from awarding the bid to a bidder other than Essex, the lowest responsive bidder, will not harm defendant, Introl, or any other interested party in this proceeding. The pro-

curement was delayed through June 9, 1983, due to actions of others than Essex. The procurement can be accomplished timely with the injunction in place. Considerations of national defense or national security do not support withholding permanent injunctive relief.

Finally, in addition to the public interest in insuring the integrity of the procurement process, the interest in minimizing the cost of federal procurements is served by prohibiting an award to Introl. Essex bid $123,-765 less than Introl.[12] Although such a differential would not detract from an otherwise rational decision in favor of a higher bidder, the irrational—and ultimately unfair—treatment to which the Essex bid was subjected foreclosed an award at Essex's substantially lower price. In this context prohibiting award of the contract elsewhere is consistent with the overriding purpose of federal procurements to serve the public weal at a reasonable cost. The balance between the government interest "in smooth and efficient functioning of the procurement process at the expense of the [interest] ... of the unsuccessful bidder in the integrity of the bidding process and equal access to the procurement dollar," *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 n. 9 (D.C.Cir.1982), is struck in favor of the latter.

## CONCLUSION

Based on the foregoing, plaintiff's cross-motion for summary judgment is granted, and defendant's is denied.

The following order was entered on August 11, 1983:

IT IS ORDERED, effective August 11, 1983, at 12:20 p.m.:

1. Essex's bid on IFB DTFA–02–82–B 00663 is responsive.

2. Defendant, by and through the Federal Aviation Administration, its officers, agents, and employees, is permanently enjoined from treating Essex's bid on IFB DTFA–02–82–B–00663 as nonresponsive.

3. The Federal Aviation Administration (and the Small Business Administration, if necessary) shall make a determination of Essex's responsibility within 14 days and advise the court of the determination.

4. Defendant, by and through the Federal Aviation Administration, its officers, agents, and employees, is permanently enjoined from awarding the contract on IFB DTFA–02–82–B–00663 to any entity other than Essex absent order of the court pursuant to ¶ 3 above.

5. Defendant, by and through the Federal Aviation Administration, its officers, agents and employees, is enjoined from cancelling IFB DTFA–02–82–B–00663 and resoliciting for the same or substantially the same equipment for a period of two (2) years, absent order of the court pursuant to ¶ 3 above. Essex can petition the court to extend this period to prevent evasion of this order.

6. Defendant, by and through the Federal Aviation Administration, its officers, agents, and employees, is permanently enjoined from terminating any contract to Essex (awarded upon a determination of bidder responsibility pursuant to ¶ 3 above) other than for the Federal Aviation Administration's own convenience or for default or as a result of violation of statute, *e.g.,* conflicts of interest or kickbacks.

7. Counsel for defendant shall communicate by no later than 3:00 p.m., August 11, 1983, the contents of this order to the contracting officials of the Federal Aviation Administration and shall deliver to them a copy of the opinion to be filed on August 12, 1983.

8. All other requests for relief by plaintiff are denied.

\* \* \*

Plaintiff shall have its costs.

---

12. Forster's bid was $67,814.00 less than Essex's. Introl's bid was $43,679 less than that of the fourth lowest bidder.