HONEYWELL, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Haz–Tad, Inc., Third Party Defendant.

No. 698–88C.

United States Claims Court.

Jan. 13, 1989.

Paul C. Fuener, Washington, D.C., for plaintiff. Gregory A. Smith and Gail D. Frulla, of counsel.

Paula Barton, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

Melvin Rishe, Washington, D.C., for third-party defendant. Garry S. Grossman and Richard D. Lieberman, of counsel.

## OPINION

FUTEY, Judge.

This pre-award contract action is before the court on plaintiff's motion to enjoin the Department of the Army from awarding a contract to Haz–Tad, Inc. to produce and deliver Digital Group Multiplexers and related hardware. The contracting officer found Haz–Tad, Inc.'s bid ambiguous as to the bidder's identity and therefore non-responsive. However, on protest to the Government Accounting Office, a recommendation was issued which concluded that the bid was responsive. The Army thereafter adopted the General Accounting Office's recommendation. Plaintiff asserts, *inter alia*, that Haz–Tad, Inc.'s bid is ambiguous as to the identity of the bidder and a determination to the contrary violates Federal procurement practices and the government's obligation to consider Honeywell's bid fairly and honestly. For the reasons stated hereinafter, plaintiff's motion for a permanent injunction of the award of the subject contract to Haz–Tad, Inc. is granted.

### Factual Background

On July 1, 1987, the United States Army Communications Electronic Command (Army) issued a request for technical proposals, No. DAAB07–87–R–J042, for the first step of a two-step sealed bid procurement[1] for the production and delivery of Digital Group Multiplexers (DGMs) and re-

lated hardware.[2] Six bidders submitted step one technical proposals. Upon review, the Army determined that five of the six proposals were technically acceptable, including that of plaintiff and third-party defendant Haz–Tad, Inc. (Haz–Tad). On March 18, 1988, the Army issued invitations to these five companies to submit the second step of the bid. In response, the Army received four sealed bids.

Bid opening was conducted on April 18, 1988. Haz–Tad was found to have submitted the lowest bid, with a total bid price of $69,120,064.00. The second lowest bidder, Honeywell Inc. (Honeywell), submitted a total bid price of $69,618,646.00.

Honeywell filed a pre-award protest with the Army contracting officer on May 11, 1988, alleging that Haz–Tad's bid failed to present an unqualified offer to perform the contract as a regular dealer or manufacturer as required by the Solicitation and the Walsh–Healey Public Contracts Act (Walsh–Healey Act).[3] Haz–Tad, Hazeltine Corporation (Hazeltine) and Tadiran Ltd. (Tadiran), responded to Honeywell's protest on June 3, 1988, alleging that the three companies had bid as a joint venture, thus qualifying under the Walsh–Healey Act. In a letter dated June 10, 1988, Honeywell additionally protested the award of the contract to Haz–Tad on the ground that the bid was non-responsive because the identity of the bidder was ambiguous.

The Defense Contract Administration Service informed the contracting officer on June 20, 1988, that Haz–Tad did not qualify under the Walsh–Healey Act, however, a joint venture among Haz–Tad, Hazeltine and Tadiran would qualify. Three days later the Defense Investigative Service reported to the contracting officer that Haz–Tad, the corporation, met the necessary security clearances required under the contract, but that a joint venture among Haz–

---

1. The procedures for two step sealed bidding are set forth in Federal Acquisition Regulations, 48 C.F.R. § 14.5 (1987).

2. DGMs are used in the Army's TRI–TAC tactical communications system to link field units with shelter-mounted units.

3. The Act requires that a bidder must be "the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract." 41 U.S.C. § 35(a) (1982).

Tad, Hazeltine and Tadiran could not be granted the necessary clearance because Tadiran was an Israeli Company.

On July 6, 1988, the contracting officer rejected the bid, finding it ambiguous as to the identity of the bidder, and therefore non-responsive. The contracting officer also stated that the bid was nonresponsible if the bidder was Haz–Tad, the corporation, alone, because it did not qualify under the Walsh–Healey Act. Additionally, the bid was nonresponsible if the bidder was a joint venture, because it did not have the required security clearance.

Haz–Tad, Hazeltine and Tadiran filed a protest on July 20, 1988, with the General Accounting Office (GAO),[4] alleging that the bid was that of a joint venture consisting of Haz–Tad, Hazeltine and Tadiran. In a letter to the GAO dated September 16, 1988, these companies asserted in the alternative that if the bid was not construed as being offered by a joint venture between the companies, their proposal could reasonably be interpreted as having been submitted by Haz–Tad, the corporation.

The GAO issued a recommendation on November 17, 1988, which determined that the bid was submitted by Haz–Tad, the corporation, and not a joint venture. Additionally, the GAO recommended that the record be forwarded to the Department of Labor for a determination as to the status of Haz–Tad as a regular dealer or manufacturer. The GAO held that "[i]f that determination is affirmative, and if otherwise appropriate, the contract should be awarded to Haz–Tad, Inc." [5]

Plaintiff filed a "Complaint for Injunctive Relief and Declaratory Judgment" in this court on December 6, 1988, requesting that the Army be enjoined from awarding the contract to Haz–Tad. The government represented to this court in a telephone conference held on the same date this action was filed that the Army decided to abide by the recommendation of the GAO and award the contract to Haz–Tad, but would not award the contract until after December 19, 1988.[6]

On December 8, 1988, the defendant filed a "Motion for the Issuance of Notice to Third Parties ..." providing for notice to Haz–Tad, Hazeltine and Tadiran to appear as parties in this action and assert their interest. On December 14, 1988, Haz–Tad filed a "Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction." Trial was held on December 16, 1988.

In the present action Honeywell asserts that Haz–Tad's bid (1) is ambiguous as to the identity of the bidder, and (2) does not satisfy the requirements of the Walsh–Healey Act. Therefore, such an award would violate Federal procurement law, regulations and policies, and constitute a breach of the Army's contractual obligation to consider Honeywell's bid fairly and honestly.

*Discussion*

Jurisdiction to review pre-award contract decisions of a government agency is conferred on this court pursuant to 28 U.S.C. 1491(a)(3) (1982), of the Federal Courts Improvement Act of 1982. *United States v. John C. Grimberg Co. Inc.*, 702 F.2d 1362, 1366–72 (Fed.Cir.1983). This section provides:

> To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court

---

4. The GAO has authority to review contract procurement protests pursuant to 31 U.S.C. §§ 3551–3556 (Supp. IV 1986), of the Competition in Contracting Act of 1984.

5. Plaintiff and defendant stated at trial that the GAO recommendation of November 17, 1988 improperly suggested that the record be forwarded to the Department of Labor for a determination of the eligibility of Haz–Tad under the Walsh–Healey requirements. Transcript at pp. 40, 62–63.

6. Defendant's trial brief, at p. 3, states that "[o]n November 21, 1988, the Army notified all parties of its intention to abide by the decision and recommendation of the GAO and to award the contract to Haz–Tad."

shall give due regard to the interests of national defense and national security. Pre-award contract claims under this statute are founded upon an implied-in-fact contract which arises by virtue of the bid solicitation process which obligates the government to consider offers fairly and honestly. *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1237 (1970); *Heyer Prod. Co. Inc. v. United States*, 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 413 (1956); *Paxson Elec. Co. Inc. v. United States*, 14 Cl.Ct. 634, 638 (1988). Accordingly, plaintiff's suit is properly before this court.

The contracting officer's decision of July 6, 1988, determined after a "thorough review of the Step 1 offer and Step 2 bid of HAZ–TAD, Inc., ... it is unclear whether the legal entity which submitted the offer and bid was HAZ–TAD, Inc., acting solely as a separate entity, or as part of a joint venture with Tadiran and Hazeltine Inc." The contracting officer therefore rejected the bid as non-responsive.

This decision was elaborated upon in the contracting officer's statement of July 28, 1988, which was printed in the August 3, 1988 agency report submitted to the GAO by the Army. This statement explains that the contracting officer's decision was based on a review of step one and two of the bid, as well as "the numerous submissions by representatives of both Honeywell and Haz–Tad, Inc....."

■ In determining that the contracting officer had reached the wrong conclusion, the GAO stated, *inter alia*, that no reliance should have been placed upon the post-bid opening submissions in determining the responsiveness of the bid. It is not clear from the contracting officer's decision and statement the degree of reliance he placed on outside information. However, the determination as to whether a bid is responsive must be based solely on the bid documents themselves as they appear at the time of bid opening. *Mack Trucks, Inc. v. United States*, 6 Cl.Ct. 68, 71 (1984); *Essex Electro Eng'rs Inc. v. United States*, 3 Cl.Ct. 277, 286 (1983). Therefore, the contracting officer should not have relied on information other than the bid documents to determine whether the bid was responsive, if in fact he did.

■ The recommendation of the GAO, which the Army has adopted, may not be overturned unless no rational basis for this determination exists. *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 684–85 (1985); *Caddell Const. Co. v. United States*, 7 Cl.Ct. 236, 241 (1985). In finding that the bid was that of a corporation, the recommendation stated:

> The technical proposal contained a 12–page "Description of Joint Venture" which (1) stated that Hazeltine and Tadiran had agreed to form a joint venture, (2) described the "joint venture corporation" as the prime contractor, with Hazeltine and Tadiran as subcontractors, (3) stated that "the name of the joint venture is Haz–Tad, Inc.," and that a contract would be taken in the name of and on the basis of the joint venture, and (4) proposed that the DGM contract be signed by authorized signatories of both companies, to signify their acknowledgment and acceptance of their responsibilities for the terms and conditions of the contract. The Haz–Tad, Inc. second step bid contained the same signature (sic) and certification as its technical proposal, with the additional identification of Hazeltine as the bidder's parent company and majority stockholder.

.     .     .     .

Clause K.8 of the RFTP required a certification regarding the type of business organization submitting the offer. Haz–Tad, Inc. identified itself as a New York corporation and did not check the "joint venture" block. Further, in the test of its proposal, Haz–Tad, Inc. explained that Hazeltine Corporation and Tadiran, Ltd. "have formed" a joint venture for the purpose of manufacturing DGM equipment and that "the joint venture corporation will be the prime contractor and will award subcontracts to Hazeltine and Tadiran for the technical and manufacturing portions of the work." While the proposal did state that the "joint venture" would have a board of directors

comprised of five individuals from Hazeltine and Tadiran, and referred to other cooperative and structural arrangements among the three firms, the proposal also specifically stated that "the name of the joint venture is 'Haz–Tad, Inc.,'" and that the "DGM contract award will be taken in the name of and on the basis of the joint venture."

Thus, the GAO concluded:

[T]he technical proposal described a joint venture between Hazeltine and Tadiran, with the corporation Haz–Tad, Inc. created as a vehicle to implement the agreement between the two corporations. Neither the step one proposal nor the step two bid contained evidence that the protester had entered into an agreement with Hazeltine and Tadiran to be part of a joint venture. We believe that based upon the bid as submitted, the identity of the bidder was established as Haz–Tad, Inc., a corporation owned and controlled by Hazeltine and Tadiran.

.    .    .    .    .

We think that the bid documents (step one and step two) establish the identity of the bidder as Haz–Tad, Inc., the corporation, which was formed as a result of a joint venture between Hazeltine and Tadiran for the purpose of bidding on this solicitation.

.    .    .    .    .

Based on the record before us, Haz–Tad, Inc. appears to be a duly formed corporation, willing to perform in accordance with the terms of the solicitation.

█ The GAO recommendation, finding that the term "joint venture" was used simply as an explanative word to describe the corporation created through the joint venture of Hazeltine and Tadiran is oversimplistic and ignores the plain language of the bid. The GAO overlooked the crucial differences between a corporation and a joint venture. The intent of Hazeltine and Tadiran to enter into a joint venture is clearly reflected in the proposal.

The first step of the bid is filled with references to a joint venture. Following a brief introduction, the first page of the bid proposal reads:

## I.  JOINT VENTURE

Hazeltine Corporation and Tadiran Ltd. have formed a joint venture for the purpose of manufacturing and testing Digital Group Multiplexer (DGM) equipment. The joint venture corporation will be the prime contractor and will award subcontracts to Hazeltine and Tadiran for the technical and manufacturing portions of the work.[7]

The joint venture corporation will be responsible for overall program management, coordination of subcontractor efforts, customer interface, warranty administration, and contract/subcontract administration. These responsibilities will be accomplished at the joint venture's office, located at Hazeltine's facilities in Greenlawn, New York.

The proposal thereafter describes the joint venture as follows:

## SECTION I

## DESCRIPTION OF JOINT VENTURE

### 1.1  PARTIES TO THE JOINT VENTURE

Hazeltine Corporation and Tadiran Ltd. have agreed to form a joint venture to conduct the production and testing of the Digital Group Multiplexer (DGM) equipment for the U.S. Army in compliance with Solicitation DAAB07–87–R–J042. The arrangement emphasizes Hazeltine's first article planning and test experience and Tadiran's manufacturing experience with similar products. This approach also brings the corporate and legal commitment of both companies together for the successful implementation of the DGM program.

With respect to prime contracts awarded to the joint venture for the DGM program, the division of work is expected to be as follows. Hazeltine will be charged with primary responsibility for the first

---

7.  At trial, counsel for Haz–Tad responded to this court's inquiry as to the meaning of a joint venture corporation by explaining that it was "not a legal term." Transcript at p. 50.

article testing activities and the assembly and test of the end items. Tadiran will be charged with primary responsibility for the production of circuit card assemblies (CCAs) and subassemblies, including spares. All such work will be performed by the parties under subcontracts issued by the joint venture and administered by the joint venture through the program manager.

Following this description, the bid describes Hazeltine and Tadiran individually as to their history and capabilities. This discussion of these companies' resources is consistent with a joint venture which requires a "community of interest in the performance of the subject matter."[8]

Additionally, the discussion of the responsibilities of Hazeltine and Tadiran in the first step of the bid is indicative of a joint venture in which co-venturers are individually liable for performance and debts. By contrast, in a corporation, only the corporate entity is responsible for the liabilities incurred. The bid evidences the responsibility of Hazeltine and Tadiran to the joint venture in the following passages:

> This approach also brings the corporate and legal commitment of both companies together for the successful implementation of the DGM program.
>
> .   .   .   .   .
>
> The DGM contract is proposed to be signed in the name of the joint venture by authorized signatories of both companies, which will be deemed as acknowledgment and acceptance by them of their responsibilities for the terms and conditions of the contract.

Furthermore, the involvement of Hazeltine and Tadiran in management, as illustrated by the proposal, resembles that of coventurers in a joint venture. The proposal describes the ability of both companies to direct and govern policy as follows:

> 1.2 STRUCTURE AND ORGANIZATION
>
> The joint venture will have a Board of Directors comprising five individuals. The Chairman of the Board will be one of the five members. Three of the Board members will be appointed by Hazeltine, including the Chairman, and two by Tadiran.
>
> .   .   .   .   .
>
> The Board of Directors will be responsible for approval of the corporation strategic and business plans and must approve any deviations from plan and all actions not specifically authorized or intended.
>
> Reporting to the Board of Directors will be a management committee that handles the ongoing activities of the joint venture and the administration of the subcontracts. Initially, the committee will comprise a President, Vice President, and a Secretary/Treasurer. The President and Secretary/Treasurer will be appointed by Hazeltine and cleared to the Secret level. The Vice President will be appointed by Tadiran.
>
> .   .   .   .   .
>
> Within their respective organizations, Hazeltine and Tadiran will each assign a full-time Program Manager who will be responsible for performance and directly accountable for day-to-day activities of its subcontract. While these Program Managers will report to their respective management organizations, they will also be the primary interface for the DGM program between the two companies and the Joint Venture Program Manager.

The bid also refers to a Hazeltine/Tadiran team. This appears to denote the formulation of a joint venture. The joint venture Program Office functions and responsibilities are summarized below:

> • Provides the necessary management and administrative functions for the Hazeltine/Tadiran team.
>
> .   .   .   .   .
>
> The Hazeltine/Tadiran team maintains corporation quality assurance programs that begin during concept formulation and continue through design, procurement, manufacture, test, and shipping.

---

**8.** Black's Law Dictionary 531 (5th ed. 1979).

Furthermore, paragraph K. 67 of the second step of the bid purports that all three companies Haz–Tad, Hazeltine and Tadiran were offerors. This section is prepared in the following manner:

**K.57 DISCLOSURE OF PROPOSAL PREPARATION ASSISTANCE (JUL 1987)**

The entire contents of this proposal (have) have not been prepared by employees of __Haz-Tad Inc., Hazeltine Corp.__ (enter to fill in company name). and Tadiran, Ltd.

If outside assistance has been utilized, as indicated by marking "have not" above, describe below:

(List specific portions of proposal and who provided assistance).

Portion of Proposal          Who Provided Assistance

_____      _____

_____      _____

_____      _____

_____      _____

(End of Section K)

---

In contrast to these indications of a joint venture, other portions of the bid indicate that the bidder was a corporation. In the first step of the bid, clause K. 8, the section requiring certification as to the status of the bidder, was marked with an "X" in the area reserved for corporations. Similarly, clause K. 4 of the second step, in which the bidder is to indicate the status of the offeror, is also marked in the area for corporations. Step one as well as step two of the bid were signed only by the president of Haz–Tad. Additionally, the cover letter accompanying the first step of the bid, and the entire second step of the bid, with the exception of clause K. 67, only referred to a corporation.

Ambiguity as to the offeror's identity persists throughout the bid. The cover page of the first step contains both the name of "Haz–Tad, Inc." in bold print, and "A Hazeltine/Tadiran JOINT VENTURE" at the bottom of the page. The bid's use of terminology, the meaning of the language and the manner in which the forms were filled out, taken as a whole, can't be read as clearly indicating that the bidder is Haz–Tad, the corporation, Haz–Tad the joint venture, or the joint venture of Haz–Tad, Hazeltine and Tadiran. This ambiguity cannot be overcome through explanation. Therefore, the contracting officer was in the position to rationally determine, from a reading of the four corners of the bid, that the identity of the offeror was ambiguous.

The GAO recommendation ignored the blatantly ambiguous wording of the bid, as well as its underlying meaning. There is no rational basis upon which such a determination can be based. Furthermore, considering the importance of classifying the bidder as a corporation or a joint venture, and the magnitude of the bid, it is unrealistic that such a crucial difference was overlooked.

Pursuant to the Federal Acquisition Regulations, "[t]o be considered for award, a bid must comply in all material respects with the invitation for bids. Such compliance enables all bidders to stand on an

equal footing and maintains the integrity of the sealed bidding system." 48 C.F.R. § 14.301 (1987). "Any bid that fails to conform to the essential requirements of the solicitation shall be rejected." 48 C.F.R. § 14.404–2(a) (1987).

▇ In instances where a bid deviates from the solicitation due to a minor informality or mere form, a bidder may be given an opportunity to correct the defect or omission. *Grade–Way Const. v. United States,* 7 Cl.Ct. 263, 265 (1985). However, a defect or variation which materially affects price, quantity, quality, or delivery of the solicited products, when contrasted with the total cost or scope of the supplies or services being acquired, is substantial, and may not be cured. 48 C.F.R. § 14.405 (1987).

A bid that does not clearly evidence the identity of the bidder does not conform to the essential requirements of the bid solicitation.[9] Moreover, this represents a material defect in the bid which can not be corrected. It does not allow for the procurement official to adequately assess the requirements necessary to award the contract. Additionally, such a bid does not exhibit an intent of a bidder or bidders to be bound by the terms of the contract. These factors directly impact upon the price, quantity, quality and delivery of the solicited products. Therefore such a bid must be rejected as nonresponsive. "Rejection of irresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud." *Prestex Inc. v. United States,* 162 Ct.Cl. 620, 626, 320 F.2d 367,

372 (1963) (citation omitted); *see also Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 219, 597 F.2d 1371 (1979); *Mack Trucks,* 6 Cl.Ct. at 71.

▇ The GAO determined that the bid was responsive without giving any deference to the contracting officer's decision. Procurement officials responsible for making awards are generally given wide discretion in evaluating offers. *CACI Field Services, Inc. v. United States,* 12 Cl.Ct. 680, 684 (1987); *Caddell Const.,* 7 Cl.Ct. at 240–41. The issue of whether the GAO accorded the contracting officer's decision the proper deference, however, need not be determined. Although not required, the Army has decided to follow the GAO recommendation. Thus, the only matter that must be resolved is whether there is no rational basis for that finding. As discussed hereinabove, no rational basis exists.

▇ Generally recommendations of the GAO are accorded "due weight and deference by this court given the GAO's long experience and special expertise in ... bid protest matters." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 668 (1983) (citation omitted). However, the case at bar involves the interpretation of bid documents to determine the identity of the bidder. The GAO has no greater specialty in this area than the Claims Court and its predecessor. Decisions of the GAO are merely "recommendations", 31 U.S.C. § 3554 (1982), and not binding on this court. *See Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 63, 617 F.2d 590, 597 (1980); *Essex Electro,* 3 Cl.Ct. at 282. Conse-

---

**9.** GAO recommendations are instructive on this issue. The Comptroller General has determined that a bid must evidence the intent of the bidder to be bound under the contract on the face of the bid. *Hewett–Kier Const. Inc.,* B–225412, 86–2 CPD ¶ 530 (Nov. 6, 1986). A bid which is susceptible to more than one reasonable interpretation as to the identity of the party or parties to be bound is ambiguous, *see Hirt Telecom. Co.,* B–222746, 86–2 CPD ¶ 121 (July 28, 1986), and such a nonresponsive bid cannot be considered for award. *See Atlas Contractors, Inc./Norman T. Hardee, a Joint Venture,* B–208332, 83–1 CPD ¶ 69 (Jan. 19, 1983). To allow

an offeror to specify the entity to be bound after the submission of the bid would give the bidder an unfair advantage. *Ace Art Co., Inc.,* B–202353, 81–1, CPD ¶ 252 (April 1, 1981). Additionally, in two step bidding procedures, the second step of the bid is to be solicited only from the bidder which submitted the first step. *G & C Enterprises, Inc.,* B–186748, 76–2 CPD ¶ 367 (Oct. 28, 1976), *aff'd on reconsideration,* 77–1 CPD ¶ 155 (March 2, 1977). Award of a contract to an entity other than that named in the bid constitutes an improper substitution of bidders. *Griffin Construction Co.,* B–185790, 76–2 CPD ¶ 26 (July 9, 1976).

quently, this court is not bound by the GAO recommendation.

█ To obtain injunctive relief in the Claims Court a disappointed bidder must demonstrate, in addition to success on the merits, that (1) granting injunctive relief is in the public interest, and (2) the plaintiff will be irreparably injured without such relief. *See PNM Const. Inc. v. United States,* 13 Cl.Ct. 745, 747 (1987); *Heli–Jet Corp. v. United States,* 2 Cl.Ct. 613, 616 (1983). Injunctive relief will only be granted if these factors weigh in favor of the plaintiff. *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 557 (1984); *Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983).

The inherent ambiguity of the subject bid appears to be a direct attempt to circumvent disqualification of the offeror. Only Haz–Tad, the joint venture, could meet the necessary Walsh–Healey requirements, while the security requirements resulting from Tadiran being a foreign-owned corporation could only be overcome if Haz–Tad was a corporation.

When initially confronted with Honeywell's protest, Haz–Tad, Hazeltine and Tadiran contended, *only,* in their June 3, 1988, letter to the contracting officer, that Haz–Tad was a joint venture.[10] It was not alleged that the bid could be interpreted as that of a corporation until September 16, 1988, just prior to the GAO decision. In the interim, counsel for Haz–Tad, Hazeltine and Tadiran sent two additional letters vociferously stating that the bidder was a joint venture. Furthermore, in the September 16, 1988 letter, only one page of the twenty-seven page document mentioned an alternative reading of the bid.

The ambiguous bid and subsequent efforts of Haz–Tad, Hazeltine and Tadiran to avoid disqualification is an abuse of the procurement process. Allowing an offeror to assert a new identity in order to meet procurement requirements gives that bidder an unfair advantage over competing offerors. An award of the subject contract to Haz–Tad would compromise the integrity of the government procurement system and would allow future bidders to proceed in the same surreptitious manner. Accordingly, the public interest will be furthered by the grant of a permanent injunction in that it will guarantee fairness and honesty in the procurement process.

Pursuant to 28 U.S.C. § 1491(a)(3), an injunction may not issue if national security and national defense interests will be jeopardized. The record is void of evidence that such interests will be impaired by injunctive action.

Honeywell's injury resulting from an award of the contract to Haz–Tad could not be adequately addressed through an action for damages. Absent an injunction, plaintiff would be unable to obtain the present contract and the profits derived therefrom. Such loss represents irreparable harm. *See Quality Transport Services, Inc.,* 12 Cl.Ct. 276, 282 (1987); *Essex Electro,* 3 Cl.Ct. at 287. Accordingly, entitlement to injunctive relief has been established through clear and convincing evidence. *See Baird,* 1 Cl.Ct. at 664.

Since the Army has not made a final determination as to whether Haz–Tad meets the Walsh–Healey requirements, a decision by this court on that issue would be premature.

*Conclusion*

For the reasons stated hereinabove, IT IS HEREBY ORDERED:

1. Plaintiff's application for a TRO is moot.
2. Plaintiff's motion for preliminary injunctive relief is moot.
3. Plaintiff's request for a permanent injunction is granted in that the award of the subject contract to Haz–Tad, Inc., as a corporation or joint venture, or any combination of Haz–Tad, Inc., Hazeltine Corporation

**10.** Counsel for Haz–Tad, Inc. asserted at trial that "all parties made a variety of assertions to support a variety of different issues that were raised, and their positions differed and varied from time to time." Transcript at p. 47.

and Tadiran Ltd., is permanently en-
joined.

No costs.