**516**

**MTB GROUP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 05–375C.

United States Court of Federal Claims.

June 7, 2005.[1]

J. Randolph MacPherson, Washington, DC, for plaintiff. Michael J. Noonan, Halloran & Sage LLP, of counsel.

Delisa M. Sanchez, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Angela T. Puri, United States Department of Housing and Development, of counsel.

### OPINION

CHRISTINE O.C. MILLER, Judge.

This pre-award bid protest is before the court after argument on the complaint by one of a select number of contractors that regularly bid for the same contract to enjoin performance of a Reverse Auction Program ("RAP") procurement administered by the United States Department of Housing and Urban Development ("HUD"). Plaintiff seeks to preclude HUD from implementing a procurement procedure that allegedly violates subsections 423(a) and (b) of the Procurement Integrity Act, 41 U.S.C. § 423 (2000), *amended by* the E–Government Act of 2002, Pub.L. No. 107–347, § 209(d)(4), 116 Stat. 2899, 2930–31, as well as 48 C.F.R. § 3.104–3(a), (b) and 48 C.F.R. § 3.104–4(a), (b) (2004), because the procurement process allows for the unauthorized disclosure of contractor bid proposal or source selection information, and because use of the procedure will

---

1. This opinion was issued under seal on May 20, 2005. The parties were given the opportunity to identify protected/privileged material subject to deletion by June 6, 2005. No deletions were requested.

result in auction participants knowingly obtaining contractor bid or proposal information or source selection information.

## FACTS

MTB Group, Inc. ("plaintiff"), is a housing inspection services company that performs property inspection services for HUD, state housing finance agencies, public housing authorities, and private multi-family property companies. Affidavit of Stephen Paquette, Apr. 1, 2005, ¶ 5.[2] According to Mr. Paquette,[3] much of plaintiff's work involves the use of a uniform physical condition standards ("UPCS") protocol, a HUD-prescribed protocol. *Id.* Plaintiff alleges that the Reverse Auction Program Business Rules, UPCS Inspection Services (Nov. 17, 2004) (the "Rules"), for HUD's Reverse Auction Program, violate applicable procurement standards. *See* A.R. Ex. 22. Because operation of the reverse auction procurement procedure is a comprehensive process that would require considerable explication, only those features germane to resolving the issue before the court are presented.

### I. *Background*

HUD owns, insures, and subsidizes rental housing in which approximately 4,000,000 American families live. In order to ensure the overall upkeep and safety of HUD properties, UPCS standards were established in 1998; these standards make certain that HUD housing meets particular requirements for decent, safe, sanitary housing in good repair. Declaration of Nelson E. Stephens, Apr. 5, 2005, ¶ 4 ("Stephens Decl.").[4] In order to achieve its safety, sanitary, and good repair standards, HUD uses contract inspectors trained in the use of the Real Estate Assessment Center (the "REAC") electronic data collection devices and physical assessment software.[5] *Id.* ¶ 6.

HUD developed an "innovative paperless e-procurement" in the form of a reverse auction to manage its inspection services needs, and the REAC developed the actual Reverse Auction Program. Stephens Decl. ¶¶ 8–9. This procurement process calls for HUD to post a property or a group of properties[6] to be inspected on an auction website. Eligible contractors bid on those properties, and the REAC awards a purchase order to the lowest qualified bidder. Stephens Decl. ¶¶ 9, 13. An online reverse auction differs from a government agency's usual method of awarding contracts to vendors by allowing a bidder continually to bid down its price until the close of the auction, as opposed to submitting one offer, thereby competing with other participants in the auction as bids are entered on the reverse auction website. *See Matter of MTB Group, Inc.,* 2005 WL 433615, at *1 (Feb. 23, 2005) (the "GAO Decision"). This online reverse auction process requires participants to submit bids, quotations, or proposed prices for the performance of UPCS inspection services at the listed locations. Plaintiff complains that the process elimi-

---

**2.** During briefing, plaintiff submitted three affidavits by Mr. Paquette. They will be referred to, as follows:

Affidavit of Stephen Paquette, Apr. 1, 2005: "Paquette Aff. 1."
Supplemental Affidavit of Stephen Paquette, Apr. 11, 2005: "Paquette Aff. 2."
Further Supplemental Affidavit of Stephen Paquette, May 9, 2005: "Paquette Aff. 3."

**3.** Stephen Paquette has been the President of MTB Group, Inc., since 2000. In that capacity he has overseen certain of plaintiff's contracts with HUD and is plaintiff's primary official responsible for "review and evaluation" of the RAP. Paquette Aff. 1, ¶¶ 1–2.

**4.** Nelson E. Stephens has been the Program Manager of the Physical Inspection Assessment Sub-system within the HUD Office of Public and Indian Housing—Real Estate Assessment Center since 2002; he previously was employed as an auditor in the HUD Office of Inspector General. Mr. Stephens has been thoroughly involved in the development of the Reverse Auction Program, including the creation of the Rules. Stephens Decl. ¶ 2.

**5.** In an indication of the parties' debate of the number of inspectors bidding on various properties, Mr. Stephens notes that over the last seven years HUD has trained approximately 940 inspectors. Stephens Decl. ¶ 7.

**6.** Through these auctions, contracts may be issued by "lots," which consist of one or more properties. Each property contains one or more residential buildings with multiple dwellings. For inspection purposes, a statistically valid sample is determined for each property to be inspected.

nates proper competition between auction participants because other small business inspection firms, along with plaintiff's own subcontractors, will be able to obtain or derive plaintiff's pricing and pricing strategy information and then use such data to plaintiff's disadvantage in an ongoing auction and in later auctions involving the same HUD properties. Paquette Aff. 1, ¶ 20.[7]

The online reverse auctions are structured to proceed in the following manner: HUD will inform reverse auction contractors[8] via email of the upcoming auction, including the number of properties in that auction, the time open for bidding, and the dates when the inspections must occur. A.R. Ex. 22 at 332. During the auction, participants are to submit quotations to the online auction website; this website will display the property to be inspected, the current lowest quotation, and the time remaining in the auction. The reverse auction website displays, among other material, the following six columns of information for each separate property or lot:[9] the identification number for each individual property; the "starting price" or maximum price set by HUD; the pricing decrement for bids ($5.00, as specified by the Rules); the identification of the price as a proxy bid;[10] the bid price given for each inspection by the participant actually using the website at that moment; and a restatement of the proposed price by the participant for each property. *See* Def.'s Br. filed May 3, 2005.

In its May 3, 2005 Supplemental Brief, defendant informed the court and plaintiff that HUD would remove a column, entitled "Leading Bid Breakdown,"[11] from the RAP

7. Many of plaintiff's assertions in this and other portions of Mr. Paquette's first affidavit refer to the release of "property-by-property unit pricing." As HUD has removed the Leading Bid Breakdown column, *see infra* note 11, this information will no longer be released on this level. Plaintiff's argument is unaffected, however, because it argues that despite the removal of the Leading Bid Breakdown column, HUD's reverse auction still allows for the release of prices on the lot level and causes the same harm plaintiff attributes to the release of information on the property-by-property level.

8. In order to be eligible to participate in a reverse auction and access the reverse auction website, a contractor must (1) ensure that all inspectors under its auspices are certified in the UPCS inspection protocol and in the current version of the Data Collection Device software; (2) maintain a minimum of $500,000.00 in general liability insurance; and (3) maintain and provide proof of status as a Level 2, on-line service MasterCard vendor. Additionally, participation in the Reverse Auction Program is limited to contractors that are classified as a small business and meet the small business size standard for the North American Industry Classification System. A.R. Ex. 19 at 330.

9. A reverse auction will list both single properties and "lot auctions." A lot auction consists of a group of properties clustered together for award to a single contractor. If a bidder submits a bid for one property within the lot, it must submit a separate bid for each property within the lot. The bidder with the lowest total price for the lot auction will be awarded the inspection work for all properties in that lot, although each property remains separate and the bidder is paid separately for each property inspection. Paquette Aff. 1, ¶ 11(c), (d).

10. A proxy bid allows a participant to place a bid even when not logged onto the auction website. To effectuate this proxy bid, a participant places an initial bid and lists a floor price below which it is not willing to bid. Each time another bidder enters a lower bid, the participant's proxy bid enters a successive bid at the next lowest price until it reaches the participant's floor price.

11. The "Leading Bid Breakdown" column was present when plaintiff initially sought an injunction in this matter. HUD removed it after the first argument on the parties cross-motions was held on April 15, 2005. Both plaintiff and defendant had opportunity to brief and argue the effect, if any, of this change. The Leading Bid Breakdown column displayed the per-property bid amount of the leading bidder during the auction. Defendant asserts that the purpose of this column "was to show offerors who utilized the proxy bid tool why they may not be the leading bidder for a lot when the aggregate amount of their per-property bid minimums is lower than the leading lot bid amount." Def.'s Br. filed May 3, 2005, at 9 n. 5. Plaintiff, on the other hand, took issue with this column and claimed it allowed competitors to know the property-by-property pricing breakdown for the lowest bidder at any point during the auction. Paquette Aff. 1, ¶ 14. Plaintiff was not placated when HUD announced that it would abandon use of this column. Plaintiff believes auction participants will still be able to infer the unit prices, direct labor costs, and profit rates of competitors because of HUD's use of individual property bid amounts, maximum and minimum prices, estimated inspection time, and release of all total lot prices during the auction. Paquette Aff. 3, ¶¶ 1, 6.

website. *Cf.* A.R. Ex. 13 at 195. When the auction is complete, all vendors will be able to view the submitted quotations, including the winning quotation. The vendor with the winning quotation will be sent a purchase order, and the unsuccessful vendors will be provided with the name and quotation of the winning vendor. Unsuccessful vendors will not be provided with the identity of the other unsuccessful vendors. Stephens Decl. ¶ 25.

In addition to the current six columns of information listed on the reverse auction website, plaintiff focuses on the fact that the website displays each individual participant's lowest bid; the total number of bids submitted by all bidders; and a summary of the amounts of all bids submitted, identified either as submitted by the participant viewing the screen or by another bidder (in which case the bidder is identified only as "bidder" on the screen). *See* A.R. Ex. 13 at 196. Plaintiff also points out that, when one or two bidders compete for a particular property, the reverse auction website informs them that they have either one competitor or no competitors and what, if any, price has been submitted by that competitor. Plaintiff asserts that, even when more than two participants bid on a particular property, each participant can determine the approximate number of competitors and their proposed prices through the reverse auction website. Paquette Aff. 1, ¶¶ 14, 19.

Mr. Stephens' explanation of the format for this process is extremely informative and presents a clear understanding of information revealed during a reverse auction. Bidders' identities, screen names, or any other bidder-identifiable information are not displayed to other bidders. Stephens Decl. ¶¶ 18–20, 23. During the auction the address of the property to be inspected, the time remaining in the auction, the current lowest bid, and the amount of each total bid price submitted can be seen by all auction participants. *Id.* ¶ 19. A bidder sees its own bidder identification number next to its own bid(s), but is only able to see the word "bidder" next to all other bids. *Id.; see* A.R. Ex.

13 at 196. A bidder cannot enter its indirect costs or direct labor rates on the reverse auction website. Stephens Decl. ¶ 21. Mr. Stephens emphasized that the only information that a bidder can see regarding another bidder is the total bid amount next to the word "bidder." *See* A.R. Ex. 13 at 196. No other identifying information concerning other bidders is available to individual bidders. Stephens Decl. ¶¶ 18–20, 22–23. Because the "Leading Bid Breakdown" column will be removed from all future online auctions, *see supra* note 11, only the total contract price per lot will be viewable online, and per-property bid amounts will not be disclosed. Def.'s Br. filed May 3, 2005, at 9, Ex. A.

Despite the measures in place to assure anonymity, as explained by Mr. Stephens, and HUD's decision to remove the Leading Bid Breakdown column, plaintiff remains concerned with the deductive disclosure of information. *See* Paquette Aff. 3, ¶¶ 1, 2, 7. Plaintiff portrays the UPCS inspection services marketplace as one with a limited number of likely bidders for most properties. Out of approximately 241 certified inspectors in active status nationwide, for example,[12] plaintiff estimates that a maximum of 125 to 150 inspectors will participate in reverse auctions. Paquette Aff. 1, ¶ 10. When extrapolated to a state level, plaintiff asserts that, while some states may have eight to ten prospective bidders, many states will have less than five possible participants. *Id.* ¶¶ 8, 10. Moreover, only high density properties will have more than two or three bidders, whereas the more frequent low density properties will have only one to two bidders. *Id.* ¶ 10.

Because of this limited number of bidders, plaintiff fears a lack of anonymity in the reverse auction bidding process resulting from the "small community of inspection firms and inspectors competing for the inspections offered." Paquette Aff. 1, ¶ 10. Further, plaintiff asserts that the cost of the inspector and overhead costs of inspection performance are the only two cost elements that a bidder must consider when placing a

---

**12.** The Administrative Record shows that there are 485 total inspectors of active and inactive status. A.R. Exs. 17, 18.

bid; hence, due to the small market of inspectors and restricted number of potential bidders, along with the sharing of information that already occurs within the small community of certified, active inspectors,[13] revealing a vendor's price during an auction event necessarily discloses its labor and overhead costs, along with profit rate.

## II. *Applicable statutes and regulations*

Provisions of both the United States Code and the Federal Acquisition Regulations (the "FAR") prevent certain individuals from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a)(1). This prohibition applies to "a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement[,]" and, because of that office, employment, or relationship, "has or had access to" the information protected in 41 U.S.C. § 423(a)(1). *Id.* § 423(a)(2). Plaintiff also relies on 41 U.S.C. § 423(b), which prohibits an individual from "knowingly obtain[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." Source selection information consists of, among other things, proposed prices submitted in response to an agency solicitation, *id.* § 423(f)(2)(B), and competitive range determinations that "identify proposals that have a reasonable chance of being selected for award of a contract[,]" *id.* § 423(f)(2)(G).

The present matter also implicates 41 U.S.C. § 423(h), which creates apparent exceptions to 41 U.S.C. § 423(a) and (b). Specifically, pursuant to 41 U.S.C. § 423(h)(1), subsections 423(a) and (b) do not "restrict the disclosure of information to, or its receipt by, any person or class of persons authorized, in accordance with applicable agency regulations or procedures, to receive that information[.]" Furthermore, a contractor is not restricted from disclosing his own bid or proposal information, and the recipient of that information is not restricted from receiving it. *Id.* § 423(h)(2).

48 C.F.R. § 3.104–3(a) mirrors the language of 41 U.S.C. § 423(a)(1), and 48 C.F.R. § 3.104–3(b) mirrors the language of 41 U.S.C. § 423(b). Similarly, 48 C.F.R. § 3.104–4(a) embodies 41 U.S.C. § 423(a)(1) in its prohibition that "no person or other entity may disclose contractor bid or proposal information or source selection information to any person other than a person authorized[.]" 48 C.F.R. § 3.104–4(e) is akin to the exemptions provided under 41 U.S.C. § 423(h).

In supplemental briefing, the parties presented additional regulations. In the pre-award context, after receipt of proposals, 48 C.F.R. § 15.306(e)(3) prevents government officials from, among other things, revealing one offeror's price to another offeror without the initial offeror's permission. In the post-award context, 48 C.F.R. § 15.503(b)(2) requires a contracting officer, upon request, to furnish certain information to an unsuccessful offeror, including the number of offerors solicited, the number of proposals received, the name and address of each offeror receiving an award, the items, quantities, and stated unit prices of each award, and the general reasons the offeror's proposal was not accepted, 48 C.F.R. § 15.503(b)(1)(i)-(v), "in solicitations using simplified acquisition procedures in part 13." Notably, 48 C.F.R. § 15.503(b)(1)(v) prevents an offeror's cost breakdown, profit, overhead rates, trade

---

**13.** Ironically, plaintiff is concerned with the revelation of information through HUD's reverse auction procurement process, yet it notes that, within the relatively small community of certified and active inspectors the amounts paid to them per inspection by the current [Uniform Physical Inspection Protocol ("UPIP")] contractors are often shared, through at least three (3) active websites/chat rooms. In those chat rooms, the inspectors share information and complaints regarding HUD/REAC and the UPIP contractors (i.e., MTB, OSI, BISCO). Paquette Aff. 1, ¶ 17. While this information does not reveal directly a contractor's pricing strategy, it does release information that plaintiff appears to be arguing—because plaintiff wants no information revealed—should be kept secret in the reverse auction process.

secrets, manufacturing processes and techniques, or other confidential business information from being disclosed to another offeror. 48 C.F.R. § 15.506(d)(2) requires, at a minimum, a debriefing on the selection process to include the "overall evaluated cost or price (including unit prices), and technical rating, if applicable, of the successful offeror and the debriefed offeror, and past performance information on the debriefed offeror[.]" Content of the debriefing is restricted in part by 48 C.F.R. § 15.506(e)(3), which prevents disclosure of, among other things, "[c]ommercial and financial information that is privileged or confidential, including cost breakdowns, profit, indirect cost rates, and similar information[.]"

### III. *History of plaintiff's involvement in reverse auctions*

In May 2004 [14] HUD announced a Reverse Auction Program to purchase UPCS inspection services for the REAC. On June 7, 2004, the REAC announced that a reverse auction would be employed to solicit bids for the inspection services. Plaintiff, on June 23, 2004, filed a protest with the GAO in regard to HUD's May 2004 Rules and Purchase Order Terms and Conditions ("POTC") that were to be used in the RAP. On September 3, 2004, after HUD filed an Agency Report and plaintiff submitted Comments, Supplemental Comments, and Further Supplemental Comments, the GAO conducted a telephonic alternative dispute resolution conference with representatives of HUD and plaintiff. The GAO at that time informed HUD that its Rules and POTC were defective and that the GAO would, at least in part, sustain plaintiff's protest. As a result of this information, HUD informed the GAO through a September 9, 2004 letter that it would clarify the Rules and POTC. On September 21, 2004, because HUD agreed to amend the Rules and POTC of the Reverse Auction Program, the GAO dismissed plaintiff's protest. *Matter of: MTB Group, Inc.,* File: B–294239 (Sept. 21, 2004).

This decision by HUD to amend its reverse auction procedures did not obviate plaintiff's objections to the reverse auction process. On November 17, 2004, HUD announced a second reverse auction, to begin on November 29, 2004, for the inspection of approximately 330 properties in Georgia and Pennsylvania. Concurrently, HUD, as promised, issued revised Rules, effective November 17, 2004, and POTC that corrected some of the problems identified in plaintiff's June 23, 2004 protest. Plaintiff wasted little time in filing a second protest with the GAO on November 26, 2004, regarding the revised Rules and POTC. Plaintiff's protest focused on two primary problems with HUD's revised Rules and POTC: (1) The procedures established by the Rules and POTC improperly disclosed—and/or required bidding contractors to allow disclosure of—certain information, such as contractor bid or source selection information, in violation of federal statutes and regulations; and (2) the procurement procedures improperly broke down the inspections into individual purchases, so that HUD could use the simplified acquisition procedures in 48 C.F.R. Part 13 and thereby avoid requirements for procurements conducted under 48 C.F.R. Parts 14 and 15, which plaintiff contends to be a violation of 48 C.F.R. § 13.003(c)(2). The GAO issued a decision on February 23, 2005, denying plaintiff's protest. *Matter of: MTB Group, Inc.,* 2005 WL 433615, at *1.

The GAO Decision addressed plaintiff's complaint that HUD's reverse auction for the REAC was improper because it required the disclosure of bidding vendors' prices during the auction. The reverse auction was conducted pursuant to FAR Part 13.[15] The GAO determined that plaintiff did not establish that HUD's use of reverse auctions violates 41 U.S.C. § 423(a), 48 C.F.R. § 3.104–3, or 48 C.F.R. § 3.104–4, and that an objection to HUD's use of the reverse auction procurement procedures could not be sustained. The GAO mentioned that the FAR does not prohibit specifically the use of reverse auc-

---

14. From November 2003 through April 2004, HUD conducted pilot reverse auctions for inspection services. Stephens Decl. ¶ 10.

15. *See* 48 C.F.R. §§ 13.000–13.5.

tions and that procurement procedures not prohibited specifically are allowable. The GAO also emphasized the intent of FAR Part 13 to streamline the nature of the procurement process, and that a reverse auction assists in this process.

The GAO deemed plaintiff's principal objection to the reverse auction-that such auction is impermissible because it discloses price-to be without justification. Plaintiff pointed to 41 U.S.C. § 423(a)(1), which provides that "[a] person described in paragraph (2) shall not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." [16] In its determination the GAO relied on 41 U.S.C. § 423(h)(1), which provides that disclosure of information is not restricted to authorized persons, and 41 U.S.C. § 423(h)(2), which allows a contractor to disclose its own bid or proposal information and the recipient of such information to receive it. As such, the reverse auction's price disclosure falls within the exceptions of 41 U.S.C. § 423(h)(1) and (2). The GAO's reasoning was based on the facts that (1) the vendor itself reveals his price, which is not prohibited by 41 U.S.C. § 423(h)(2); and (2) even if, assuming, *arguendo,* it is the Government that releases prices as a condition of competing, the "disclosure is pursuant, and integral, to the reverse auction procurement procedures established by the agency[.]" GAO Decision at 3.

Finally, plaintiff charged that HUD divided its need for inspection services into smaller installments and therefore violated 48 C.F.R. § 13.003(c)(2), which advises agencies not to break procurements into smaller purchases solely so as to use the simplified procedures and/or to avoid the requirements for purchases exceeding the thresholds. The GAO rejected plaintiff's argument, finding that HUD's reasoning for parsing inspections into smaller bidding lots was to expand the field of competition so that all interested

inspectors-single inspectors as well as larger inspection companies-would be able to compete as providers for inspection services.

Following this determination, on March 1, 2005, HUD announced another reverse auction, to be conducted during the third week of March 2005. This auction covered UPCS inspection services at approximately 450 locations in Georgia, Pennsylvania, and Illinois. Again, the Rules and POTC would govern the auction, and plaintiff alleges that the version of these rules and conditions for the March 2005 auction was the same as those issued on November 17, 2004.

Plaintiff filed its complaint and application for a temporary restraining order in the United States Court of Federal Claims on March 16, 2005. At a scheduling hearing conducted on March 17, 2005, HUD agreed to withhold award pending this court's ruling on expedited cross-motions for summary judgment and oral argument scheduled for April 15, 2005. During argument, the parties agreed that further briefing was needed to address issues raised in plaintiff's April 12, 2005 brief. Following delayed briefing schedules and agency decisions, a second oral argument was held on May 17, 2005, at which the court announced that an injunction would not issue. The parties were agreeable to withholding further action until the court issued this opinion.

## DISCUSSION

Plaintiff levies the same charges against the present procurement as it did for the past reverse auctions; these are the same claims the GAO ruled upon in its February 23, 2005 GAO Decision. Plaintiff argues that HUD's reverse auction procurements violate 41 U.S.C. § 423(a) and 48 C.F.R. §§ 3.104–3(a) and 3.104–4(a) and (b) because these procurement procedures will knowingly disclose contractor bid or proposal information. Plaintiff further contends that HUD's reverse auction procurements will violate 41 U.S.C. § 423(b) and 48 C.F.R. § 3.104–3(b)

---

**16.** "A person described in paragraph (2)" consists of "(A) a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to, a Federal agency procurement; and (B) by virtue of that office, employment, or relationship has or had access to contractor bid or proposal information or source selection information." 41 U.S.C. § 423(a)(2).

because they will result in the auction participants' knowing receipt of contractor bid or proposal information or source selection information before the award of the contract.

## I. *Jurisdiction and Standard of Review*

The Tucker Act prescribes jurisdiction for the Court of Federal Claims in a pre-award bid protest by allowing a protestor to challenge "a proposed contract or ... a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1) (2000). In bid protest actions, the court applies the standards of review set forth in the Administrative Procedure Act (the "APA"). 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003). Under 5 U.S.C. § 706(2)(A) (2000 & Supp.2002), a protestor must show the agency decision to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law[.]" However, when resolving a matter within its bid protest jurisdiction, the Court of Federal Claims merely is exercising jurisdiction using the APA standard of review; it is not reviewing agency action under the APA. *See Banknote Corp. of Am.*, 365 F.3d at 1350–51.

The arbitrary and capricious standard contemplates that review will consist of determining whether (1) a rational basis for the agency's decision is lacking or (2) a violation of an applicable regulation or a procedure occurred during the procurement procedure. *Id.* at 1351; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001); *see Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir. 1996). Under the first ground, a court must determine "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir. 1994)). A protestor, in such a situation, has the burden of showing that the agency's award decision had no rational basis. *Id.*

When, as here, a challenge is made under the second ground, a protestor "must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. In the context of a pre-award bid protest, the United States Court of Appeals for the Federal Circuit has stated that "not all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief." *Central Arkansas Maint. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995); *see LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1556 (Fed.Cir.1995) (disclosures in violation of the FAR did not harm contractor "in any concrete way[,]" thereby preventing relief); *Cleveland Telecomms. Corp. v. Goldin*, 43 F.3d 655, 659 (Fed.Cir.1994) (a "minor omission" in violation of the FAR was not, in that instance, prejudicial and did not provide for termination of procurement process). If the record demonstrates no reasonable possibility of a competitive prejudice to the protestor, even though there is a defect in the procurement, the protestor's claim should not be sustained. *Statistica, Inc.*, 102 F.3d at 1581. For a protestor to establish prejudice, it "must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." *Banknote Corp. of Am.*, 365 F.3d at 1351; *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999); *Statistica, Inc.*, 102 F.3d at 1581; *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1563 (Fed.Cir.1996). The parties have addressed, among other concerns, the primary issue for determination: whether the reverse auction violates statute and the applicable procurement regulations.

The pending cross-motions for summary judgment upon the administrative record pursuant to RCFC 56.1 are reviewed under the same standards as motions for summary judgment. *See* RCFC 56(c). Nevertheless, "the court must distinguish the trial court's judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed.Cir.2005). This is so because RCFC 56.1 does not incorporate RCFC 56(c) or(d), which base a denial of summary judg-

ment on a genuine issue of material fact. *Id.* at 1355–56. A motion under RCFC 56.1 restricts the evidence to the agency record as properly supplemented. *Id.* Hence, this court, when making a prejudice analysis, must "make factual findings under RCFC 56.1 from the record evidence as if it were conducting a trial on the record." *Id.* at 1357. Despite the similarities in motions under RCFC 56 and RCFC 56.1, a motion for summary judgment upon the administrative record differs from a general summary judgment motion because the latter's standards have little influence on the review of the administrative record in a bid protest case: Although an administrative record may contain facts that are both deemed disputed and material by the parties, the question is whether a protestor has shown, by a preponderance of the evidence, that an agency's action was arbitrary and capricious or that the agency violated a regulation in play. Stated another way, when the record displays sufficient facts to uphold the rationality and legality of a procurement decision, the court may resolve the case on the administrative record. *See Bannum, Inc. v. United States,* 60 Fed.Cl. 718, 724 (2004), *vacated and remanded on other grounds,* 404 F.3d 1346 (Fed.Cir.2005) (ruling that case may be resolved on administrative record with disputed facts if protestor fails to show decision is not rational or regulation was violated).

## II. *The GAO Decision*

■ Because defendant reiterates a prevailing theme in bid protest matters, it is appropriate to comment on the law relating to the deference afforded to the GAO Decision of February 23, 2005, by which the GAO determined that HUD's use of reverse auctions is lawful. Defendant argues that an agency is required to consider a GAO decision when making procurement determinations. Therefore, it extrapolates, the reasonableness of an agency's decision to follow the GAO decision should set the metes and

bounds for judicial review. This latest approach to limiting the court's exercise of its bid protest jurisdiction would confine review to determining whether an agency rationally relied on and followed a GAO decision. This defies logic: If such were the scope of review, then any agency action based on a GAO decision would qualify as rational based solely on the GAO decision. In fact, while the Court of Federal Claims affords deference to a GAO decision and does not conduct review *de novo,* the court's charge is to determine, based on the record before the contracting officer,[17] whether an agency's procurement decision was reasonable. *E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 135 (1995), *aff'd,* 77 F.3d 445 (Fed.Cir.1996). Defendant's misperception of the role of the GAO Decision in the court's review, however, does not imperil its other, more appropriate, arguments in reliance upon the regulatory scheme in this matter.

As a secondary position, defendant relies on *Honeywell, Inc. v. United States,* 870 F.2d 644 (Fed.Cir.1989), to support its contention that a GAO decision should play an important role in the resolution of a bid protest matter. Def.'s Br. filed Apr. 5, 2005, at 11. In *Honeywell* the Federal Circuit reversed the trial court's determination that a decision by the Comptroller General adopted by the agency lacked a rational basis.[18] The Federal Circuit ruled that the GAO's decision was rational. *Honeywell,* 870 F.2d at 648–49. As explained in *E.W. Bliss Co.,* 33 Fed.Cl. at 134–35, the trial court in *Honeywell v. U.S.,* 16 Cl.Ct. 173 (1989), had conducted a *de novo* analysis and had not accorded due weight or deference to either the agency procurement decision or the GAO decision (adopted by the agency). *Honeywell* does not stand for the proposition that the GAO decision supplants the decision of the procurement official or that it is binding on the court.

Defendant is correct that decisions by the Comptroller General have been afforded a

---

**17.** In rare instances the agency adopts the GAO decision as the basis for award.

**18.** In *Honeywell,* the Comptroller General disagreed with the contracting officer's determination that a bidder had filed a non-responsive bid and recommended that the Army award the con-

tract. When the Army subsequently awarded the contract, a disappointed bidder filed a protest in the former United States Claims Court, prompting the Claims Court's decision. 870 F.2d at 646–47.

degree of deference. *See Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed.Cir.2003), *aff'd*, *Cherokee Nation v. Leavitt*, — U.S. ——, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005), ("the opinions of the [GAO] ... [and] the opinions of the Comptroller General, ... while not binding, are expert opinions, which we should prudently consider") (quotations omitted); *E.W. Bliss Co.*, 33 Fed.Cl. at 134 ("decisions by the Comptroller General have been accorded a high degree of deference by the courts, particularly those decisions involving bid protests"). However, defendant fails to recognize that this court's predecessor firmly established the place of GAO decisions: In *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 63, 617 F.2d 590, 597 (1980), the court succinctly stated that the "Court of Claims is not bound by the views of the Comptroller General nor do they operate as a legal or judicial determination of the rights of the parties."

*Honeywell* and *Burroughs* are different cases, and the former does not replace the rule of the latter. The Federal Circuit in *Honeywell* merely criticized *de novo* review. *See Honeywell*, 870 F.2d at 649. Instead, the trial court's proper task, like its predecessor's task, is to determine whether the procurement official's decision was reasonable or in accordance with regulation. *See Banknote Corp. of Am.*, 365 F.3d at 1351; *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1331; *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed.Cir.1994) (citing *Honeywell*, 870 F.2d 644).

The court has afforded the GAO's February 23, 2005 decision due consideration and gives proper deference to it insofar as it discusses the merits of plaintiff's claim. Unlike defendant apparently suggests, however, the court does not review HUD's action solely from the date of the GAO Decision-in essence, only reviewing HUD's actions from February 23, 2005, onward-but, rather, will review the entirety of the administrative record generated by HUD.

**19.** Previously, 48 C.F.R. § 15.610(e)(2) (1996), prohibited "auction techniques." During 1997 revisions of the FAR, however, this provision was removed. Instead, guiding principles for the

## III. *Injunctive relief*

■ The Federal Circuit has described injunctive relief as "extraordinary relief." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983). In order to obtain a permanent injunction, plaintiff must demonstrate by a preponderance of the evidence that (1) it has achieved actual success on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004); *FMC Corp.*, 3 F.3d at 427. No one of the four factors is determinative. *FMC Corp.*, 3 F.3d at 427. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

### 1. *Success on the merits*

■ Because the court does not promulgate regulations for government agencies, review is focused upon whether HUD's actions appropriately adhered to statute and established regulations. Assuming, *arguendo*, that plaintiff can first show a violation of statute or an applicable regulation, then it must demonstrate that the violation was competitively prejudicial. Facially, plaintiff does not meet either burden. An examination of HUD's actions against the backdrop of 41 U.S.C. § 423, 48 C.F.R. § 3.104–3, and 48 C.F.R. § 3.104–4 supports the conclusion that plaintiff cannot succeed on the merits of its claim.

Of initial import is the that fact that auctions are lawful procurement mechanisms.[19]

FAR state that "if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive

HUD's reverse auction process requires prospective bidders to submit bids in an online environment viewable to other bidders. Plaintiff argues that this prerequisite for competing for a HUD inspection contract violates the disclosure prohibition of contractor bid or proposal information, or source selection information under 41 U.S.C. § 423(a) and 48 C.F.R. § 3.104–3(a). These provisions do not carry plaintiff's burden, however, because this statute and regulation apply to a "present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States with respect to" a federal procurement. 41 U.S.C. § 423(a)(2)(A); 48 C.F.R. § 3.104–3(a)(2)(i). Prospective bidders in HUD's reverse auctions are not among the categories of individuals contemplated under these provisions.

Plaintiff also cites 41 U.S.C. § 423(b) and 48 C.F.R. § 3.104–3(b) for the prohibition of any individual knowingly obtaining contractor bid information or source selection information prior to the award of a federal procurement contract under the presumption that other bidders would be those "knowingly obtaining contractor bid information" when they view the reverse auction website and see the bids of fellow competitors.[20] Again, plaintiff cannot overcome the intendment of 41 U.S.C. § 423(h)(2) and 48 C.F.R. § 3.104–

4(e)(1), which affirmatively remove a contractor from the disclosure prohibition when it discloses its own bid or proposal information. At the same time, these provisions also allow the recipient of that information to receive it. 41 U.S.C. § 423(h)(2); 48 C.F.R. § 3.104–4(e)(1).

Despite plaintiff's failure on the merits, one issue of interest is whether plaintiff truly volunteered the revealed information. In its reply brief, plaintiff introduced a line of cases that address the compulsory and voluntary disclosure of a contractor's pricing and cost information under the umbrella of the Freedom of Information Act, 5 U.S.C. § 552(a) (2000 & Supp.2002) ("FOIA"), which instructs government agencies to make publicly available certain information. *See* Pl.'s Br. filed Apr. 12, 2005, at 8. Exemption 4 of FOIA, however, prevents release of "trade secrets and commercial or financial information obtained from a person and privileged or confidential[.]". *Id.* § 552(b)(4).[21]

Plaintiff cites three cases that are pertinent to this issue:[22] *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 215 F.Supp.2d 200 (D.D.C.2002); *MCI Worldcom, Inc. v. Gen. Servs. Admin.*, 163 F.Supp.2d 28 (D.D.C.2001); *Chem. Waste Mgmt., Inc. v. O'Leary*, 1995 WL 115894, 1995 U.S. Dist. LEXIS 2586 (D.D.C. Feb. 28, 1995). The court discusses the cases chrono-

---

order or other regulation, ... the strategy, practice, policy or procedure is a permissible exercise of authority." 48 C.F.R. § 1.102(d) (2004). While 48 C.F.R. § 15.306(e)(3) prevents government officials from revealing an offeror's bid to another offeror prior to bid award, nothing in the plain language of this subsection (e) prohibits the use of auction techniques. *See DGS Contract Serv., Inc. v. United States*, 43 Fed.Cl. 227, 239 (1999).

**20.** Defendant cites *DGS Contract Serv., Inc.*, 43 Fed.Cl. 227, for the proposition that source selection information may be released during a procurement if allowed by the contracting officer or the agency head. Plaintiff argues that *DGS* presents the general rule that source selection information may not be disclosed, except in limited circumstances, and that no ongoing release of source information during a procurement is proper. While *DGS* offers a strong, thorough analysis of procurement issues, *id.* at 235–42, it is *gratis dictum* for the case at bar because *DGS* opined on an issue not before that

court. *See id.* at 238. No such scenario is present in the current case. While plaintiff would like the court to view the ruling in *DGS* as a condemnation of HUD's reverse auction—because *DGS* may implicitly, by allowing the disclosure of source selection information as a remedial measure, disallow the disclosure of source selection information outside of that context—the court cannot do so.

**21.** Although the parties' primary arguments focus on whether the reverse auction procurement process violates 41 U.S.C. § 423(a) and its accompanying regulations, the question of what impact, if any, a "compulsory" disclosure has on the procurement process presents an interesting tangential issue. As discussed in the caselaw, a determination that disclosure was "compulsory" does not, in and of itself, mandate the release of information under FOIA.

**22.** All three of these decisions are federal district court decisions that constitute persuasive authority.

logically, as they develop a doctrine. In *Chemical Waste Management*, plaintiff requested an injunction ordering the Department of Energy ("DOE") not to disclose unit price information submitted by plaintiff when it bid on a subcontract for a government management and operations contract between DOE and Westinghouse Savannah River Company ("Westinghouse"). *Chem. Waste Mgmt.*, 1995 WL 115894, at *1, 1995 U.S. Dist. LEXIS 2586, at *1. Plaintiff invoked Exemption 4 of FOIA and argued that this exemption applied to unit prices. The procurement process in *Chemical Waste Management* was not a reverse auction procurement procedure, and a caveat is attached to discussion of its facts.

Plaintiff in *Chemical Waste Management* was required to submit, in response to a request for proposals ("RFP"), a completed Compensation Schedule detailing its unit prices. *Id.* at *1, 1995 U.S. Dist. LEXIS 2586 at *3. Plaintiff had been awarded a subcontract in July 1993; Westinghouse exercised the option to extend the subcontract through July 1995. *Id.* at *2, 1995 U.S. Dist. LEXIS 2586 at *5. This triggered a FOIA request from plaintiff's competitor, Laidlaw Environmental Services. Plaintiff contended that Exemption 4 of FOIA applied to its Compensation Schedule because the Schedule contained unit pricing data.[23] In its discussion, and pertinent to the case at hand, the United States District Court for the District of Columbia distinguished, for purposes of its FOIA analysis, between the voluntary and compulsory release of this information in the bidding process: "[P]laintiff had no choice but to submit the unit price informa-

tion once it chose to submit its proposal. The RFP compelled Chem Waste to submit its unit prices." *Id.* at *4, 1995 U.S. Dist. LEXIS 2586 at *12. The court discussed the tests governing release of confidential information under FOIA's Exemption 4 and concluded that DOE's decision to release plaintiff's unit price information was contrary to law because (1) DOE did not rely on correct legal precedent when determining that plaintiff's unit prices did not fall within Exemption 4 of FOIA and (2) because DOE did not adequately address plaintiff's complaints of harm. *Id.* at *5, 1995 U.S. Dist. LEXIS 2586 at *17. After the court determined that the DOE's decision to release the unit price information was not sustainable on the administrative record, it remanded the matter to DOE for further proceedings. *Id.* at *6, 1995 U.S. Dist. LEXIS 2586 at *18.

In a similar scenario under FOIA, the consolidated plaintiffs in *MCI Worldcom* requested that the General Services Administration ("GSA") be enjoined from disclosing pricing information submitted as part of plaintiffs' contracts[24] to provide telecommunications services to the Government. *MCI Worldcom*, 163 F.Supp.2d at 29. Plaintiffs' submittals included pricing schedules that contained "detailed line-item pricing information ... [and] a 'break down' of the price of every call, transmission or service into its component parts." *Id.* at 30. During plaintiffs' performance GSA announced that, under a new policy, it would disclose publicly all contract unit prices in the FTS2001 Contracts, including plaintiffs' pricing schedules for the remaining years of the contracts. *Id.* GSA claimed that FAR §§ 15.503(b)(1)[25] and

---

**23.** Of interest, plaintiff in *Chemical Waste Management* argues, similar to the present plaintiff's assertion, that release of such pricing data would cause harm because competitors would be able to use such information in the rebidding of the subcontract that would occur the following year. This new subcontract likely was to contain nearly identical services as those performed under that plaintiff's current contract, thereby giving its competitors an "unfair advance look at plaintiff's likely prices when the contract is rebid." *Chem. Waste Mgmt.*, 1995 WL 115894, at *5, 1995 U.S. Dist. LEXIS 2586, at *15.

**24.** Plaintiff Sprint was awarded a Federal Technology Service ("FTS") contract on December

18, 1998. Plaintiff MCI was awarded a FTS contract on January 11, 1999. These contracts are referred to as "FTS2001 Contracts."

**25.** 48 C.F.R. § 15.503(b)(1) provides:

Postaward notices: (1) Within 3 days after the date of contract award, the contracting officer shall provide written notification to each offeror whose proposal was in the competitive range but was not selected for award .... The notice shall include-

....

(iv) The items, quantities, and any stated unit prices of each award. If the number of items or other factors makes listing any stated unit prices impracticable at that time, only the total

15.506(d)(2)[26] mandated disclosure of such information. *Id.* at 31. The district court granted plaintiff's motion for summary judgment and determined that GSA's decision to release the pricing information was arbitrary and capricious because it contravened FAR §§ 15.503 and 15.506, the Trade Secrets Act, and FOIA Exemption 4; violated GSA's own FOIA regulations; and was not a reasonably explained departure from GSA's prior actions. *Id.* at 32.

Particularly relevant in *MCI Worldcom* is the court's discussion of unit price information. *Id.* at 32–37. It reassured that "the unmistakable meaning of FAR §§ 15.503 and 15.506 is that unit price information may be disclosed, but only insofar as it does not consist of trade secrets, confidential business information or is otherwise exempt from disclosure under the FOIA, Exemption 4." *Id.* at 34–35. The court then reiterated prior decisions that found line-item pricing information to be " 'confidential commercial or financial information' " that is not disclosable under a FOIA request. *Id.* at 35 (quoting *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C.Cir.1999)). Mirroring plaintiff's concerns in the case at bar, the court relied on D.C. Circuit precedent for the proposition that disclosure of such pricing information would cause " 'substantial competitive harm' " to a bidder because it would allow competitors to underbid and create the opportunity for non-governmental customers to " 'ratchet-down' " prices, *id.* (quoting *McDonnell Douglas Corp.*, 180 F.3d at 306).

Finally, in *McDonnell Douglas*, the D.C. District Court provided an explicit discussion of the interaction between Exemption 4 of FOIA and the relevance of ascertaining whether a contractor or bidder voluntarily provides information during the bidding process, or if disclosure of information is compulsory. This distinction is pertinent in determining the appropriateness of disclosure.[27] Plaintiff in *McDonnell Douglas* was awarded the contract at issue and challenged the United States Air Force's (the "USAF") disclosure of plaintiff's contract information to plaintiff's competitor under a FOIA request, *McDonnell Douglas Corp.*, 215 F.Supp.2d at 202–03, because it claimed that parts of the contract included "confidential and proprietary pricing information[,]" *id.* at 203 (quotations omitted). The bidding process in place for the USAF's services and supplies contract for KC–10 and KDC–10 aircraft required bidders to submit "detailed cost and pricing information[.]" *Id.* The USAF determined that the contract information should be released pursuant to FOIA. *Id.*

The court's discussion of the applicability of Exemption 4 of FOIA is instructive. Initially, the court noted that such applicability turns on "whether the information that a party seeks to have disclosed by the government was provided to the government voluntarily or under compulsion." *Id.* at 204 (citing *McDonnell Douglas Corp.*, 180 F.3d at 304). Financial or commercial information voluntarily submitted to the government " 'is confidential for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained.' " *Id.* at 204–05 (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879

---

contract price need be furnished in the notice. However, the items, quantities, and any stated unit prices of each award shall be made publicly available, upon request[.]

**26.** 48 C.F.R. § 15.506(d)(2) provides:
At a minimum, the debriefing information shall include-...

. . . .

(2) The overall evaluated cost or price (including unit prices), and technical rating, if applicable, of the successful offeror and the debriefed offeror, and past performance information on the debriefed offeror[.]

**27.** This case does not involve a FOIA request; instead, the presence of a reverse auction appears to present issues of first impression to this

court. An explication and discussion of matters relevant to FOIA requests and Exemption 4—particularly the voluntariness of a plaintiff's disclosure—may be considered relevant to the present plaintiff's request. The only difference between the present facts and the facts of prior cases is that the prior cases involved the actual request under FOIA for release of information, whereas a reverse auction eliminates the need for that step because competitors immediately receive the low bidder's price bid online. Hence, the FOIA Exemption 4 tests for release of information may be relevant, even though a formal FOIA request has not been made.

(D.C.Cir.1992)). On the other hand, if information is required to be submitted to the Government, such information is "confidential" if disclosure will " '(1) ... impair the Government's ability to obtain necessary information in the future; or (2) ... cause substantial harm to the competitive position of the person from whom the information was obtained.' " *Id.* at 205 (quoting *Nat'l Parks & Conservation Assoc. v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974)). An interesting dichotomy thus exists between information voluntarily submitted and information compelled to be submitted by the Government.

In either instance, however, FOIA's Exemption 4 does not provide an immediate proscription on the disclosure of information by the Government. Instead, the method of providing such information—voluntarily or by compulsion—is key in determining the extent of its disclosure. Only then does discussion of the relative harms of disclosure to the Government and a plaintiff become relevant. The *McDonnell Douglas* district court went on to define plaintiff's submission to the USAF as "not voluntary" because it was required to provide cost and pricing information in order to compete for the contract. *Id.*

Because the USAF itself found that disclosure of the information requested would not harm its ability to obtain information in the future, the court accepted that rationale as reasonable and moved to the second part of the *National Parks* test. Plaintiff's alleged harms echoed similar fears of plaintiff in this case—to wit, plaintiff in *McDonnell Douglas* asserted that, if the USAF did not exercise the option on plaintiff's contract, plaintiff must compete anew for the contract against competitors who would be able to determine support hours, overhead factors, and profit factors for the current contract, thereby placing plaintiff at a disadvantage, *id.* at 207. Further, and similar to plaintiff's concern about the size of the qualified field of bidders, plaintiff in *McDonnell Douglas* con-tended that the limited number of qualified subcontractors signified that "competitors will have likely gone to the same subcontractors ... [and] that competitors could use the bids they have received from subcontractors and [plaintiff's] Vendor Pricing Factor to calculate [plaintiff's] markup rate, which is an inherent part of [plaintiff's] pricing strategy." *Id.* at 208. Mitigating against that inference, the USAF reasoned that competitors could not specifically determine these figures and would, therefore, not be able to cause competitive harm to plaintiff. *Id.*

In another relevant argument from *McDonnell Douglas,* plaintiff complained that release of its "Over and Above Prices" [28] would allow competitors, in conjunction with the public knowledge of plaintiff's average wage paid, to compute plaintiff's labor pricing factor, which is the "markup for support labor, overhead, and profit." *Id.* at 209. The district court found that the USAF's experience with government contracting was a reliable experience of determining the effects of disclosure of plaintiff's information. Hence, the court concluded that the release of information under FOIA was not arbitrary and capricious. *Id.*

These cases demonstrate a possible scenario for resolving plaintiff's complaint against HUD's reverse auction procedure. Although FOIA is not implicated directly in the present case, it has generated decisional law that a required disclosure of financial information in the bidding system is not voluntary. Taken together, these cases are authority that defendant cannot rely solely on 41 U.S.C. § 423(h)(2) to end this matter with the salvo that plaintiff was not required to participate in the reverse auction and that its bid was therefore voluntary.[29] Moreover, the standards for determining whether Exemption 4 applies in a particular matter offer a legitimate tool to establish whether HUD or another agency has violated the FAR through a reverse auction procedure. In the first instance the agency, not plaintiff, makes

**28.** These are charges that plaintiff would make against the USAF for items in addition to those in the contract. *McDonnell Douglas Corp.,* 215 F.Supp.2d at 209.

**29.** At oral argument on May 17, 2005, defendant conceded that no provision in the Rules requests permission from offerors to make their total bid prices available to other offerors via the reverse auction website. *See* A.R. Ex. 22.

an agency decision that the required financial information is not confidential commercial or financial matter. While that has not occurred here, the court is not prepared to invalidate reverse auctions based on the rationale of this line of cases. Therefore, the court holds that 41 U.S.C. § 423(h)(2) and 48 C.F.R. § 3.104–4(e)(1) do not prohibit HUD's reverse auction procedure because disclosure is permitted. Moreover, as will be discussed, even if these cases apply to bid protests, plaintiff's price structure is not readily discernible from the total prices that it enters for the lots.

### 2. *Irreparable harm to plaintiff*

To merit injunctive relief, plaintiff must demonstrate that it will suffer irreparable harm if such relief is not granted. *FMC Corp.*, 3 F.3d at 427. In its request for an injunction, plaintiff relies significantly on the harm it will suffer due to HUD's reverse auction procedures. Although it has been established that plaintiff fails on the merits, the court will consider the alleged harm plaintiff will suffer if the reverse auction process continues.

Generally, plaintiff asserts that HUD's reverse auction process will cause it to suffer competitively due to the release of certain information. Plaintiff relies on *Raytheon Co. v. Dep't of the Navy*, 1989 WL 550581, at *4 (D.D.C. Dec.22, 1989), for the proposition that competitive harm will result from the release of bottom-line pricing information. In *Raytheon* plaintiff challenged a third party's request under FOIA for information submitted by plaintiff as part of its unsuccessful bid for a missile contract. *Id.* at *1. The third party was the successful bidder and plaintiff's competitor. Like plaintiff in the present matter, plaintiff in *Raytheon* argued that the release of bottom-line pricing information would harm its competitive position because competitors would be aware of its

pricing strategy, *id.* at *4, and could analyze plaintiff's price proposals "with fairly simple calculations[,]" *id.* at *6. Similarly, plaintiff provides two examples of how it believes an auction participant can use the information presented on the reverse auction website to accurately assess a competitor's per day inspection price, per-property unit prices, direct labor costs, and profit rates. Paquette Aff. 3, ¶ 4.

While the court in *Raytheon* found that the release of bottom-line prices posed a likelihood of substantial competitive harm, the same cannot be said in the context of the reverse auction procedure under scrutiny. First, plaintiff has not shown a substantial likelihood of harm [30] resulting from the release of total bid information, because it has not demonstrated that the information provided on the reverse auction website, including the total bid price, allows for an inference that plaintiff asks this court to make, namely, that plaintiff's pricing strategy will be inferred. While the derivation of plaintiff's direct labor costs and profit rate, along with its per property unit prices, arguably may be obtained through the released information, plaintiff has not shown in a clear, concise manner that the likelihood is great. Rather, such derivation remains only a possibility, and one which this court views as too vague on which to rely.

Second, and more importantly, plaintiff is attacking the auction procedure as a whole.[31] As discussed, a reverse auction is permitted by the applicable regulations. The issue in *Raytheon* focused on a post-award request and did not address the procurement procedure in the current matter. Moreover, plaintiff's reliance on this case for the presumption that a public interest exists for the disclosure of awarded contract information, whereas the public interest is less in bid prices for unawarded contracts, is misguided.

---

**30.** This standard applies to FOIA challenges. While plaintiff must show a clear and prejudicial violation of the regulations at issue, plaintiff's claim under the FOIA standard may be considered, as well, due to the analogous caselaw discussed above.

**31.** At oral argument on April 15, 2005, plaintiff represented to the court that the proceeding was

initiated because plaintiff was "after reverse auctions period as well as this particular reverse auction. . . . [I]t is indeed possible that there may be a reverse auction methodology that is acceptable to my client in this process." Transcript of Proceedings, *MTB Group, Inc. v. United States*, No. 05–375C, at 63–64 (Fed.Cl. Apr.15, 2005).

The current case involves an online auction; *Raytheon* did not. The argument for disclosure due to public interest of bid prices in awarded versus unawarded contracts becomes moot when the bidding process necessitates, as here—legally—that bidders present their total bid prices online.

It is true that "evidence of specific competitive injury to [plaintiff] would establish a more compelling showing of irreparable injury warranting injunctive relief." *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir.1983). In adducing speculative scenarios, plaintiff has not demonstrated a specific competitive injury. While Mr. Paquette believes that plaintiff's release of its pricing and, through that information, its pricing strategy will assist competitors in competition against plaintiff, Paquette Aff. 1, ¶ 19, plaintiff has not demonstrated that its competitors will know that a particular bid belongs to plaintiff (and thereby want to follow plaintiff's lead because of its expertise in the field).[32] In what serves as an effort to allay plaintiff's fears of competitive imbalance and inappropriate knowledge of an individual bidder's pricing strategy, Mr. Stephens reiterates the anonymity of the reverse auction process. *See* Stephens Decl. ¶¶ 18–23.

Plaintiff presents a litany of harms that it will suffer because of the reverse auction procurement procedure: Competitors will be able to make real-time assessments of plaintiff's pricing strategies; competitors will take advantage of plaintiff's expertise by observing plaintiff's bidding on properties that it believes can be inspected in less time than HUD's estimate, thereby alerting competitors to such time-sensitive information; due to the pricing information revealed on the reverse auction website, and the fact that some auctions will involve properties in the same areas as recently conducted previous auctions, plaintiff's competitors can maintain pricing records and analyses for use in subsequent auctions; because some of their employees are certified inspectors and have access to the reverse auction website, agencies and authorities conducting the auctions will be able to "ratchet down" plaintiff's prices; and, in general, the information provided by plaintiff will provide its competitors with "competitively useful" data. Paquette Aff. 1, ¶ 20.

Plaintiff emphasizes the differences between a non-auction procurement and the reverse auction process that portend the various harms that plaintiff alleges: Unlike the traditional sealed-bid procurement, a reverse auction releases prices to competitors; reveals per-lot pricing; lists the offers of all bidders (including those that will not be awarded the contract); reveals, due to the previous releases, current information and pricing strategies; and according to plaintiff's inferences, allows for competitors to determine the number of other competitors in the particular auction. Paquette Aff. 1, ¶ 18.

Despite its list of presumed harms and comparison between an auction procurement and non-auction procurement, plaintiff's harms are speculative. Plaintiff has not established that an auction environment will harm plaintiff. The possibility that competition in the inspection services field may become tighter, while disfavored by plaintiff, does not constitute harm. In fact, Mr. Stephens offered a plausible scenario whereby the field only will expand in number of participants.[33]

### 3. *Weighing of respective harms*

While plaintiff, as a revenue-seeking business, properly is concerned with competi-

---

**32.** Plaintiff assumes that competitors will be able to determine the identity of fellow bidders because of the number of competitors in the field and the sharing of information that occurs in the inspection industry. *See* Paquette Aff. 1, ¶¶ 10, 17. While this is an understandable concern, plaintiff has not demonstrated that such an inference is warranted.

**33.** Mr. Stephens states that over the past seven years, HUD has trained approximately 940 inspectors in the REAC inspection protocol. Ste-

phens Decl. ¶ 7. Further, Mr. Stephens estimates that the REAC's intended national marketing plan will swell the ranks of inspectors to approximately 2,500 potential reverse auction participants. *Id.* ¶ 17. It should be noted that plaintiff disputes HUD's claim that HUD trained the inspectors; rather, plaintiff asserts it actually assisted, along with another company, in the training of approximately 470 of those inspectors. Paquette Aff. 2, ¶ 6.

tion and competitive balance, nothing in the reverse auction procurements administered by HUD improperly affects plaintiff's competition with fellow bidders. Plaintiff, in essence, is asking the court to endorse a procurement process that would be more advantageous to plaintiff. The court cannot do this.

Mr. Stephens offers numerous valid benefits of reverse auctions. Stephens Decl. ¶ 11.[34] Mr. Stephens also asserts that reverse auctions provide HUD with more streamlined control and management over inspections, specifically in regard to scheduling work with certified firms and individual inspectors, paying inspectors for each inspection completed, and creating a fee schedule for each inspection commensurate with the estimated time necessary to complete the inspection. *Id.* ¶ 8. In essence, the reverse auction procurement process makes the issuance and award of inspection contracts more efficient and narrowly tailored to allow HUD to achieve its objectives of consistent inspection standards; standardization of the inspections; and the use of an electronic inspection system that will objectively evaluate, rate, and rank the decency, safety, and sanitariness of HUD housing. *See id.* ¶ 5.

In an apparent effort to address plaintiff's concerns about the number of inspectors during each auction, Mr. Stephens explains that HUD has trained approximately 940 inspectors over the last seven years. *Id.* ¶ 7. He attributes the current apparent low interest in the Reverse Auction Program to limited advertising,[35] and states that, once the REAC implements its national marketing plan, HUD anticipates a significant increase in auction participants. Finally, the REAC predicts that approximately 2,500 active, certified inspectors[36] will be potential reverse

auction participants for the inspection of HUD properties. *Id.* ¶ 17. It is apparent that the parties disagree over the measure of the field of prospective bidders for inspection services; however, due to Mr. Stephens' position within HUD, and his first-hand knowledge of the reverse auction procurement process, the court finds Mr. Stephens' gauge of inspector participation a legitimate and reliable representation of the current state of the process and the anticipated participation in it. In any event, HUD acted reasonably in adopting the reverse auction procedure based on these considerations.

HUD will suffer significant harm should the Reverse Auction Program not continue. Not only does the RAP purport to maximize competition among certified small businesses, *id.* ¶ 15, but it also creates an efficient method of awarding inspection contracts for HUD housing. It also seemingly decreases prices due to the competitive nature of the process. *See id.* ¶ 3. While the RAP may not yet be perfected, and may require refinements, the court, having determined that no statute or regulation is violated through this procurement process, cannot enjoin HUD's use of such program merely because plaintiff cites an initial low turnout of auction participants.

### 4. *Public interest*

It is in the public interest for the government to conduct fair procurement procedures, and to give honest and fair consideration to all bids. *Parcel 49C Ltd. P'ship,* 31 F.3d at 1152; *see Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 n. 9 (D.C.Cir.1982).

If plaintiff were to prevail, the Government would not be able to utilize auctions in the

---

**34.** These benefits include: achieving true market pricing because of the real-time competition; giving a buyer the opportunity to pre-approve participants in the auction; allowing for the anonymity of bidders, who have the ability to continually bid down prices until the close of the auction; allowing agencies to use Best Value award criteria; allowing agencies control over the starting and ending times of auctions; collecting buying and pricing patterns; minimizing the acquisition time for agencies; and supporting competition in an automated environment. Stephens Decl. ¶ 11.

**35.** Plaintiff disputes this claim of limited advertising and asserts that HUD informed all certified, active inspectors via email regarding HUD auction activities. Paquette. Aff. 2, ¶ 10.

**36.** Plaintiff similarly disputes Mr. Stephens' belief that there will be 2,500 certified, active inspectors in the upcoming years because, according to Mr. Paquette, the "maximum number of 24,000 inspections each year .... will not sustain 2,500 inspectors." Paquette Aff. 2, ¶ 12.

procurement process; however, the public interest is served with continuation of the reverse auction procurement process. The FAR accommodates several public interests when encouraging the use of simplified acquisition procedures.[37] Although an online reverse auction is not mentioned in the FAR,[38] 48 C.F.R. § 13.002 encourages the use of methods that "[r]educe administrative costs[;]" improve opportunities for, among others, small businesses so that they receive a fair proportion of government contracts; increase efficiency and economy in the contracting process; and minimize unnecessary concerns for agencies and contractors. Without question, although the FAR does not specifically contemplate a reverse auction as a simplified acquisition procedure, defendant has demonstrated that HUD's reverse auctions attempt to meet these goals. These auctions, moreover, do not improperly break down requirements that were initially greater than the simplified acquisition threshold. Instead, HUD must list properties and lots as separate entities so that it is able to award contracts for each individual property and monitor the inspections of all properties.

**37.** The FAR mandates that "[a]gencies shall use simplified acquisition procedures to the maximum extent practicable for all purchases of supplies or services not exceeding the simplified acquisition threshold[.]" 48 C.F.R. § 13.003(a).

**38.** Although not contemplated by the FAR, the Office of Management and Budget (the "OMB"), in a May 12, 2004 memorandum, espoused the benefits of, and encouraged agencies to use, "commercially available online procurement services for the acquisition of commercial items, including goods and services." A.R. Ex. 4 at 34. Reverse auctions were one example given of online procurement services. *Id.* Further, as cited *supra* note 19, guiding principles for the FAR state that "if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, ... the strategy, practice, policy or procedure is a permissible exercise of authority." 48 C.F.R. § 1.102(d).

**39.** In fact, in a listing of situations where the administrative record could be appropriately supplemented, all mentions are made to an agency action. The material at issue here is not in light of that action; it is used only to complete the record before this court concerning the methodology of solicitation and as factual support for

**IV.** *Defendant's motions to strike*

Defendant has filed two motions to strike: The first addresses Exhibits A through E of Mr. Paquette's Affidavit, Paquette Aff. 1, and the second, Exhibits A through E of Mr. Paquette's Supplemental Affidavit, Paquette Aff. 2. Both motions are denied. Plaintiff's motion to supplement the administrative record with these materials is moot.

The information attached to Mr. Paquette's affidavits is, despite plaintiff's having moved to supplement the administrative record, offered to rebut defendant's own use of Mr. Stephens' Declaration or to support plaintiff's arguments as to why the factual suppositions made by the GAO to support its decision are in error. Plaintiff is not supplementing what is termed the "administrative record"[39]—the record that was before the agency; instead, it is challenging HUD's decision, as approved by the GAO Decision, and completing the record that is before the court.[40] The materials provided by plaintiff also create the necessary record to substantiate its factual assertions regarding the injunction factors for irreparable harm, balanc-

plaintiff's arguments for injunctive relief. Those factors are

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (quotations omitted).

**40.** If, in fact, as plaintiff initially termed it, this was a motion to supplement the administrative record, a "party may supplement the administrative record when necessary to prove that evidence not in the administrative record was, or should have been, considered, is evidence without which the court cannot fully understand the issues." *Lion Raisins, Inc. v. United States,* 51 Fed.Cl. 238, 244 (2001). As plaintiff's motion is moot, further discussion of these standards is unnecessary.

ing of the harms, and the public interest. Plaintiff's material discusses the methodology of the reverse auction procurement process and the effect of disclosing plaintiff's pricing information.

## CONCLUSION

Ultimately, plaintiff has not shown that HUD's reverse auction procedure violates statute or an applicable procurement regulation, nor that HUD acted unreasonably in adopting it. While plaintiff disfavors the reverse auction procedure, plaintiff does not prevail on the merits of the case. Plaintiff's argument is based on the assumption that competitors will be able to infer protected information from their competition. Such an inference is not sustainable.

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Plaintiff's motions for a preliminary injunction and request for a permanent injunction are denied.

2. The Clerk of the Court shall enter judgment for defendant.

3. By June 6, 2005, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.